UNITED STATES BANKRUPTCY COURT                **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                        :
                                              :        Chapter 7
ALPHASTAR INSURANCE GROUP                     :        Case No. 03-17903 (SMB)
LIMITED, et al.,                              :
                                              :
                Debtors.                      :
------------------------------------------------------X
RICHARD E. O'CONNELL, Chapter 7               :
Trustee of the Estates of ALPHASTAR           :
INSURANCE GROUP LIMITED, et al.,              :
                                              :
                Plaintiff,                    :
                                              :
        -- against --                         :        Adv. Pro. No. 06-1524
                                              :
ARTHUR ANDERSEN LLP, et al.,                  :
                                              :
                Defendants.                   :
------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART THE MOTIONS TO DISMISS THE AMENDED COMPLAINT

**A P P E A R A N C E S :**

RICHARDS KIBBE & ORBE LLP
Attorneys for Defendants Stephen A. Crane
  and Anthony J. Del Tufo
One World Financial Center
New York, NY 10281

        Arthur S. Greenspan, Esq.
        H. Rowan Gaither IV, Esq.
                Of Counsel

McCULLOUGH, CAMPBELL & LANE LLP
Attorneys for Defendant Peter S. Christie
205 N. Michigan Avenue - Suite 4100
Chicago, IL 60601

        Carl D. Liggio, Esq.
                Of Counsel

PAUL, WEISS, RIFKIND, WHARTON, GARRISON, LLP
Attorneys for the Goldman Sachs Defendants and
   Jean de Pourtales
1285 Avenue of the Americas
New York, NY 10019

      Daniel J. Beller, Esq.
      Stephen J. Shimshak, Esq.
      Claudia R. Tobler, Esq.
         Of Counsel


HOWREY, LLP
Attorneys for Defendants David H. Elliott,
   Hadley C. Ford and Patrick J. McDonough
170 South Main Street
Suite 400
Salt Lake City, UT 84101-3636

      Gary F. Bendinger, Esq.
      Nancy M. Trasande, Esq.
         Of Counsel


PETER LEVINE, ESQ.
Attorney for Defendant Nicholas Mark Cook
488 Madison Avenue, 19th Floor
New York, NY 10022


GAGE SPENCER & FLEMING LLP
Attorneys for Defendant George W. Jones
410 Park Avenue
New York, New York 10022

      William Fleming, Esq.
         Of Counsel


SULLIVAN & CROMWELL LLP
Attorneys for Defendant Reuben Jeffery III
125 Broad Street
New York, NY 10004

      Gandolfo V. DiBlasi, Esq.
      William L. Farris, Esq.
      Patrice A. Rouse, Esq.
         Of Counsel


JAMES LAWLESS IV
Defendant Pro Se

STEVENS & LEE, P.C.
Attorneys for Plaintiff
485 Madison Avenue, 20th Floor
New York, NY 10022

    Neil C. Schur, Esq.
    Nicholas F. Kajon, Esq.
    David M. Green, Esq.
    Alec P. Ostrow, Esq.
    Constantine D. Pourakis, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

    This lawsuit arose out of the collapse and eventual bankruptcy of AlphaStar

Insurance Group Ltd. ("AlphaStar"), and its numerous subsidiaries.  Richard E.

O'Connell, the chapter 7 trustee (the "Trustee"), commenced this adversary proceeding,

inter alia, against AlphaStar's former officers and directors, Arthur Andersen LLP, and

several entities affiliated with Goldman Sachs (as defined below).  The thrust of the

allegations in the Trustee's 121 page, 656 paragraph Amended Complaint, dated Nov. 8,

2006 (ECF Doc. # 81), is one usually associated with the phrase "deepening insolvency."

The Trustee contends that the defendants, using fraudulent and other improper means,

continued AlphaStar's corporate existence to advance their personal interests to the

detriment of AlphaStar.  All of the defendants other than Quick moved to dismiss the

Amended Complaint with prejudice.[1]

    The core claims are based on fraud and fraudulent conduct, and include common

law fraud, breach of fiduciary duty and aiding, abetting breach of fiduciary duty and

---

[1]     The Defendant Richards Butler also moved to dismiss the Amended Complaint.  The Trustee did
not include Richard Butler as part of the alleged cover-up described in the succeeding text.  Instead, he
asserted certain avoidance claims.  The Richards Butler claims, and the motion to dismiss those claims, will
be dealt with in a separate opinion.

equitable subordination.  The Trustee also asserts a breach of contract claim against

Goldman Sachs, and bankruptcy avoidance claims against some of the defendants.  For

the reasons that follow, the motions to dismiss the Amended Complaint with prejudice

are granted, except that the motions to dismiss the avoidance claims are denied, and the

motion to dismiss the contract claim is granted but with leave to replead.

## BACKGROUND[2]

### A.    Introduction

AlphaStar f/k/a Stirling Cooke Brown Holdings Ltd. is a Bermuda corporation

whose principal place of business was Bermuda until early 2003, when it began operating

principally from New York.  (¶¶ 31-33, 313.)  AlphaStar is the parent company of the

following group of debtors (¶ 30): Stirling Cooke North American Holdings, Inc.

("SCNAH "), Employee & Providers Resources Group, Inc., North American Risk, Inc.,

Stirling Cooke Brown North American Reinsurance Intermediaries, Inc., AlphaStar

Insurance Services, Inc., Stirling Cooke New York Insurance Agency Services, Inc.,

Stirling Cooke Risk Management Services, Inc., Stirling Cooke Southeast, Inc., Stirling

Cooke Texas, Inc., World Trade Services (NJ), and World Trade Services (PA)

(collectively, the "Debtors").  Other than AlphaStar, all of the Debtors were incorporated

in the United States.  (¶ 34.)

Prior to bankruptcy, AlphaStar and its subsidiaries provided risk management

services and products to small and mid-sized businesses.  (¶ 42.)  They also arranged

reinsurance for products offered by AlphaStar and other insurance carriers.  (¶ 42.)

---

[2]      The "Background" is derived from the Amended Complaint.  The parenthetical paragraph
notations refer to that pleading.  Allegations made on "information and belief" are indicated as such in the
discussion.

AlphaStar divided its business into three units: London, Bermuda and the United States. (¶ 43.)  In London, AlphaStar's operations consisted of Stirling Cooke Brown Holdings (UK) Limited and its subsidiaries, including Stirling Cooke Brown Insurance Brokers Limited ("SCBIB") and Stirling Cooke Brown Reinsurance Brokers Limited ("SCBRB") (collectively, the "U.K. Subsidiaries").  (¶ 44.)  By 1999, AlphaStar was winding down the U.K. Subsidiaries.  (¶ 46.)

In Bermuda, AlphaStar's operations consisted of Realm Investments Limited and its subsidiaries, including CIRCL Holdings Limited ("CIRCL"), Raydon Underwriting Management Company Limited ("Raydon"), Realm Underwriting Management Company Limited and JEH Re Underwriting Management (Bermuda) Limited ("JEH Re") (collectively, the "Bermuda Subsidiaries").  (¶ 48.)  By 1999, almost all of the Bermuda subsidiaries were in run-off.  (¶ 49.)

In the United States, AlphaStar's operations consisted of SCNAH and its subsidiaries, including Realm National Insurance Company ("Realm") (collectively, the "U.S. Subsidiaries").  (¶ 50.)  Excluding Realm, all or most of the U.S. Subsidiaries are debtors in this Court.  (¶ 51.)  All of AlphaStar's subsidiaries have been defunct for many years.  (¶ 53.)

## B.    The Defendants

### 1.    The Goldman Sachs Entities

Goldman Sachs & Co. ("Goldman Sachs") is a global investment banking, securities and investment management firm headquartered in New York.  (¶ 11.) Goldman Sachs was affiliated with The Goldman Sachs Group, Inc. and The Goldman

Sachs Group, L.P. (collectively, the "Goldman Sachs Group"), as well as GS Capital

Partners II, L.P., GS Capital Partners II Offshore, L.P., Goldman Sachs & Co.

Verwaltungs GmbH, Stone Street Fund 1995 L.P., and Bridge Street Fund 1995, L.P.

(collectively, the "GS Funds").  (¶ 12-14.)  Goldman Sachs, the Goldman Sachs Group

and GS Funds (collectively, the "Goldman Sachs Entities") were affiliated with

AlphaStar from at least 1997 through 2002.  (¶ 102.)

       The Goldman Sachs Entities essentially controlled AlphaStar.  (¶¶ 107-08.)  Prior

to AlphaStar's initial public offering in 1997 (the "AlphaStar IPO"), they owned 34% of

AlphaStar's ordinary shares, (¶ 99), and appointed two of its six board members.  (¶ 105.)

Goldman Sachs was a co-managing underwriter of the AlphaStar IPO, and received a

total of $5.3 million in underwriting discounts.  (¶ 73.)  After the AlphaStar IPO, the

Goldman Sachs Entities controlled over two million shares of AlphaStar stock, and were

the largest AlphaStar stockholder until December 2002.  (¶ 104.)  In addition, Goldman

Sachs provided AlphaStar with investment banking services and served as its financial

advisor pursuant to certain contracts (the "Goldman Sachs Contracts").  (¶¶ 81-83.)

### 2.  The Officers and Directors

#### a.       The Goldman Sachs Directors

       From January 1996 until January 2003, executives of the Goldman Sachs Entities

or their affiliates also served on AlphaStar's Board of Directors (the "Board"), including

Defendants Reuben Jeffery III ("Jeffery") and Jean de Pourtales ("de Pourtales").  (¶ 75.)

Jeffery was a Managing Director of Goldman Sachs.  (¶ 75.)  He served on the Board

from prior to the time of the IPO until at least May 23, 2001.  (¶ 58.)  de Pourtales, a

Managing Director of non-party Goldman Sachs International, (¶ 75), was a director of

AlphaStar from March 4, 1999 until at least January 16, 2003. (¶ 59.) At various times, both served on the Board's Audit, Compensation and Governance Committees. (¶¶ 58-59.)

### b.    The Other "Director Defendants"

Nicholas Mark Cooke ("Cooke") was the Chairman, President and Chief Executive Officer ("CEO") of AlphaStar at the time of the AlphaStar IPO. (¶ 55.) He resigned as President and CEO in July 1999, (¶ 184), and was replaced as Chairman in April 2000. (¶ 198.) He fully resigned from the company in November 2001. (¶ 205.)

Stephen A. Crane ("Crane") became a director of AlphaStar and its President and CEO in October or November 1999. (¶¶ 56, 190.) He replaced Cooke as Chairman in April 2000. (¶¶ 56, 198.) His base annual salary was $400,000. (¶ 56.)

David H. Elliott ("Elliott") served as a director from August 2001 until August 2003. (¶ 64.)

George W. Jones ("Jones") served as a director from before the AlphaStar IPO until at least March 12, 2003, and was AlphaStar's Chief Financial Officer until October 2001. His base annual salary was $275,000. (¶ 57.)

Patrick J. McDonough ("McDonough") served as a director from May 1999 to August 2003, and as a member of the Board's Audit and Compensation Committees. McDonough reported to the Board concerning audit issues. (¶ 60.)

Len Quick ("Quick") served as a director from July 1999 until after the petition date. Quick also served on the Board's Executive Committee, and reported to the Board

concerning operations and restructuring issues.  In July 1999, Quick's base salary was increased from $200,000 to $325,000 per annum. (¶ 61.)

Hadley C. Ford served as a director from March 2000 to August 2003.  (¶ 62.)

Peter S. Christie ("Christie") served as a director from May 2000 until between August and November 2002.  In 2000, Christie also joined the Board of Directors of SCBIB, and had extensive experience in the insurance industry (¶ 63.)

The Defendants Jeffery and de Pourtales, together with the Defendants Crane, Cooke, Elliott, Ford, Jones, McDonough, Christie and Quick, are referred to collectively in the Amended Complaint as the "Director Defendants."  (¶ 68.)

### c.  The "Individual Defendants"

Defendant Anthony Del Tufo ("Del Tufo") was not a director, but commencing in October 2001 and continuing until shortly before the petition date, he was AlphaStar's acting Chief Financial Officer.  He reported to the Board concerning financial and budgeting issues.  (¶ 65.)

James Lawless, IV ("Lawless") was not a director, but commencing in March 2000 and continuing until after the petition date, he served as Senior Vice President, General Counsel and Corporate Secretary of AlphaStar.  He reported to the Board concerning legal issues.  (¶ 66.)

Del Tufo, Lawless and the Director Defendants are referred to collectively as the "Individual Defendants."  (¶ 71.)

### 3.    The "Professional" Defendants

Arthur Andersen LLP ("Andersen") is a former "Big Five" accounting firm.  (¶¶
10, 127.)  It performed audit and non-audit services for AlphaStar and its subsidiaries
from October 1999 until May 2002, and it audited their 1999, 2000 and 2001
consolidated financial statements.  (¶ 368.) [3]

Richards Butler is an international law firm registered in London.  (¶ 27.)  SCBIB
paid Richards Butler at least $12 million (the "Richard Butler Transfers") to defend the
Sphere Drake litigation, described below, in the United Kingdom.  (¶ 473.)  The
payments to Richards Butler are the subject of avoidance claims under chapter 5 of the
Bankruptcy Code, and are proceeding on a separate track.

### C.    The London Arbitrations and Related Problems

In late 1998, the U.K. Subsidiaries and other subsidiaries were involved in
arbitrations pending in the United Kingdom (the "London Arbitrations").  The London
Arbitrations had been brought by several insurance companies to avoid policies in the
London personal accident excess of loss market ("LMX market").  (¶ 118.)   The
insurance companies claimed that through non-disclosures and misrepresentations the
U.K. Subsidiaries had fraudulently caused an "abnormally tight spiral" in the LMX
market, which caused the insurance companies to incur significant and unnecessary
losses.  (¶ 118.)  By January 1999, the Goldman Sachs Entities had begun an independent
investigation of these allegations.  (¶ 119.)

---

[3]      The Trustee settled the Estates' claims against Arthur Andersen (Counts 1-6) with the Court's
approval, for $1.2 million.

In March 1999, Odyssey Re (London) Limited ("Odyssey Re"), a reinsurer based in the United Kingdom, filed a RICO action against AlphaStar in Federal District Court in New York. (¶ 121.) Odyssey Re alleged that AlphaStar, Cooke, Nicholas Brown (who was then a Director of AlphaStar) and several AlphaStar subsidiaries had "engaged in an international conspiracy to fraudulently induce Odyssey Re to reinsure drastically unprofitable workers' compensation policies in the LMX market." (¶ 121.) The Federal District Court dismissed the case on the grounds of <u>forum non conveniens</u>. (¶ 256.)

The RICO allegation generated negative publicity that embarrassed the Goldman Sachs Entities. (¶ 122.) To protect their interests and reputation, (¶ 123), the Goldman Sachs Entities did the following: (1) escalated their investigation of AlphaStar, (¶ 123); (2) caused AlphaStar to engage Goldman Sachs as financial advisor, (¶ 123); (3) caused AlphaStar to engage the Torrenzano Group, a strategic communication firm specializing in building and protecting corporate relationships, (¶ 124); (4) used their leverage to persuade Andersen to take over as AlphaStar's auditors, after AlphaStar's previous auditors, KPMG Peat Marwick, had resigned, upon information and belief, due to the RICO action's allegations, (¶¶ 125-26); (5) and engaged Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank"), the law firm retained by AlphaStar, to investigate the claims raised in the RICO action. (¶¶ 132-33.)

### a.  Fried Frank Investigation

Fried Frank and the Goldman Sachs Entities had a close pre-existing relationship. (¶ 130.) Fried Frank had been Goldman Sachs' financial advisor in many multi-billion dollar mergers and acquisitions. (¶ 130.) Initially, Fried Frank reported the findings of its investigation to Jeffery and other employees of the Goldman Sachs Entities. (¶ 135.)

In May 1999, however, the Board created an audit committee (the "Audit Committee") comprised of Jeffery, de Pourtales and Warren Cabral. (¶ 136.) Cabral resigned from the Board eight days after his appointment to the Audit Committee, and at the insistence of the Goldman Sachs Entities, was replaced by their handpicked selection, McDonough. (¶¶ 136-37, 139.)

Fried Frank retained an investigative agency and other consultants in connection with its investigation, including an industry expert and Andersen. (¶ 140.) The head of the investigative agency admitted that he was not certain who his firm and Fried Frank worked for: Goldman Sachs, AlphaStar or both. (¶ 142.) The industry expert was also confused. He discussed his findings with Jeffery, but not McDonough, because he did not realize that McDonough was a director of AlphaStar, despite knowing him personally. (¶ 141.)

In June 1999, the Goldman Sachs Entities instructed Fried Frank to focus its investigation on all members of the Board (excluding members of the Audit Committee), all senior executives of AlphaStar and its subsidiaries and any other individuals implicated in the RICO action. (¶ 143.) This investigation, along with Goldman Sachs' own investigation, press reports and other sources, revealed that AlphaStar or its subsidiaries were run or had been run by or associated with unsavory, dishonest people who had engaged in questionable transactions:

> (1)    Brian Hynes, AlphaStar's de facto Chief Operating Officer, had been barred from the interstate insurance business due to his involvement in the failure of Anglo-American Insurance, another insurance company. Cooke and others knew that Hynes' employment was illegal, yet Cooke gave him more than $2 million in AlphaStar stock shortly before the AlphaStar IPO (¶ 147);

(2)     Cooke sponsored Carlos I. Miro for membership in Lloyd's of London. Miro had pleaded guilty to 16 counts of fraud and was sentenced to nearly nine years in prison for causing Anglo-American's failure and for contributing to the failure of Transit Casualty Company, which led to the collapse of 40 other reinsurance companies (¶ 148);

(3)     Ghaith Pharaon had been a secret shareholder of AlphaStar until Cooke bought him out.  Pharaon had appointed many of the directors serving on the Board at the time the RICO action was commenced.  Described as a "Saudi wheeler-dealer," Pharaon was indicted as a front man in the BCCI scandal (¶ 150);

(4)     Raydon, a Bermuda Subsidiary, and Paul M. Murray, its Managing Director and President, had managed North American Fidelity & Guarantee, which along with its affiliates, had defrauded insurance companies and policyholders of at least $150 million. It also benefited from the spiral in the LMX market (¶ 151);

(5)     Reginald Billyard, a Managing Director and President of the Bermuda subsidiary JEH Re, had been involved in fraudulent activities connected to the LMX market spiral (¶ 152);

(6)     Alternative Risk Reinsurance Company Limited ("ARRCL") was one of AlphaStar's two Cayman Island Subsidiaries.  AlphaStar owned 50% of ARRCL, while the principals of Unicover Managers, Inc. owned the other 50%.  ARRCL was involved in the Unicover scandal, which defrauded many insurance companies of billions of dollars (¶ 153);

(7)     Around March 1999, Nicholas Brown, an AlphaStar director at the time, made misrepresentations on behalf of the U.K. Subsidiaries to Trustmark Insurance Company and Credit General to induce them to underwrite insurance coverage.  (¶ 159.)  To resolve the situation, AlphaStar paid $5.5 million and returned over $10 million in premiums to Trustmark.  It also waived any right to brokerage commissions payable by Trustmark.  (¶ 161); and

(8)     Nicholas Brown's non-business expenses exceeded $100,000, which he "repaid" with the bonus AlphaStar gave him after his termination in October 1999.  (¶¶ 163-64.)

By 1999 (and by 2000 in the case of Crane) the Goldman Sachs Entities, Jeffery, de Pourtales, Cooke, Jones, Quick "and others" knew or should have known that AlphaStar's businesses were rife with fraud; its subsidiaries had made material

12

misrepresentations to counterparties, who were thus entitled to rescind their contractual obligations; most of AlphaStar's assets were impaired; its businesses were no longer viable; it could not afford to defend against the recent onslaught of litigation claims and it "faced a probable loss of staggering proportions." (¶ 166.)  According to Crane, Goldman Sachs was "very concerned" in 1999 that AlphaStar had "bad if not criminal associations." (¶ 168.)  Jeffery and de Pourtales got involved in AlphaStar's management to try to save Goldman Sach's reputation, which they knew was blackened by its association with AlphaStar. (¶¶ 169-172.)  Crane assumed that he was hired to "clean up the company" and "get Goldman's name out of the papers." (¶ 174.)

### b. The Sphere Drake Case

Following the dismissal of the Federal District Court action in February 2000, Odyssey Re, renamed Sphere Drake Insurance Ltd. & Odyssey Re (London) Ltd. ("Sphere Drake"), immediately filed another action in the Queens Bench Division, in London.  Sphere Drake alleged fraud and conspiracy as between SCBIB, SCBRB, Nicholas Brown and Jeff Butler (an employee of the U.K. Subsidiaries), on the one hand, and Euro International Underwriting Ltd. and certain individuals, on the other hand. (¶ 257.)  The allegations concerned a part of the reinsurance market that traded in the losses generated by U.S Workers' Compensation insurance and related products. (¶ 258.)  Sphere Drake, which had reinsured such products, challenged its obligations on the basis that a SCBIB and others had induced its participation in the market by conspiring to commit fraud and dishonestly breaching their fiduciary duties. (¶ 259.)

The Sphere Drake case took over three years to resolve.  Nevertheless, the mere pendency of the case and the other allegations of fraud in the LMX market attracted

significant negative publicity.  (See ¶¶ 318-19, 321.)  Upon information and belief,

AlphaStar changed its name to AlphaStar from Stirling Cooke Brown Holdings Limited

in April 2001 because its old name was too similar to the names of the U.K Subsidiaries.

(¶¶ 313-14.)   Furthermore, starting in May 1999, certain Board members were warning

that the negative publicity was adversely affecting AlphaStar's operations and financial

condition.  (See ¶¶ 320, 322-24.)  Consequently, the Goldman Sachs Entities, Andersen

and certain of the Individual Defendants knew that AlphaStar's 2000 and 2001

consolidated financial statements and its consolidated quarterly financial statements filed

on Forms 10-Q during 2000, 2001 and 2002 significantly overstated the value of

AlphaStar's principal assets and the amount of shareholders' equity, and significantly

understated its losses in a false and misleading manner.  (¶¶ 325-26.)

        The Sphere Drake case was decided on July 18, 2003, following a year long trial.

(¶ 263.)   The Court rendered a 1,600-page decision that authorized Sphere Drake to

reject its claims under the reinsurance contracts.  (¶ 261.)  The decision stated that this

part of the market was "one in which no rational and honest person would participate . . .

if he had understood the market and proper disclosure had been made."  (¶ 264.)  The

Court found that (1) the risks in the market were enormous, and could expose a

participant to huge losses, (¶ 264); (2) the market's structure resembled a pyramid

scheme, (¶ 265), because losses were passed higher to successive tiers of reinsurers, (¶

264); (3) each time the losses were passed, the premium was diminished by the brokers'

commission, which had to be large enough for the broker to pay his retained losses, (¶

264); (4) delays caused severe cash flow problems, (¶ 264); (5) there was a high risk that

insurers would avoid payments, or become insolvent or unable to renew the reinsurances

once they appreciated their losses, (¶ 264); (6) the market was unsustainable, (¶ 264) and

the prospectus [issued by Goldman Sachs in connection with the IPO] was grossly

misleading, did not properly describe the true nature of the reinsurance business, and "did

not describe the fact that the reinsurance was placed on a basis that was gross loss making

and that it was built on the risk that the reinsurance might not respond."  (¶¶ 273-74.)

The Court found that the U.K. Subsidiaries had deliberately accepted businesses

known to produce losses in excess of the premium, pocketed the premiums and passed on

the undisclosed risks to reinsurers for even less premium.  (¶ 266.)  The Court concluded

that because the market dealt with such large amounts of money, the dishonesty of those

involved was probably as grave any in the history of the insurance and reinsurance

market.  (¶ 262.)  It estimated that Sphere Drake's losses had been $250 million, (¶ 267),

and predicted that the total claims against AlphaStar could exceed $750 million.  (¶ 268.)

## D.    The Cover-Up

The Trustee's core claim is that the defendants squandered $80 million of

AlphaStar's assets to cover-up the problems in the U.K. and their effect on AlphaStar's

financial condition.  The Goldman Sachs Entities orchestrated the cover-up, and all of the

defendants (other from Richards Butler) joined in.

### 1.    Board and Senior Management Shake-up

Upon information and belief, the Goldman Sachs Entities took steps from May

1999 to, at least, November 2001 to solidify and tighten their control over AlphaStar;

they orchestrated a complete "shake-up" of AlphaStar's Board and senior management,

disguising each termination as a voluntary resignation.  (¶ 175.)  Upon information and

15

belief, the Goldman Sachs Entities forced the resignations of Warren Cabral, (¶¶ 176-77), Nicholas Brown, (¶¶ 187-89), and Penelope Atteline Cooke, Corporate Secretary and wife of Defendant Cooke. (¶¶ 178-79.)

On November 8, 1999, Crane became President and CEO of AlphaStar, and Quick continued as Chief Operating Officer and Director. (¶ 190.) According to Crane, he was recruited directly by Goldman Sachs, and when he first joined the Board, he dealt primarily with Jeffery and de Pourtales. (¶ 191.) While the Goldman Sachs Entities may have initially kept Crane "in the dark," by 2000, he knew or should have known the true state of AlphaStar's affairs. Crane then assisted the Goldman Sachs Entities' cover-up of such facts. (¶ 193.)

By November 1999, the Goldman Sachs Entities had caused AlphaStar to terminate most of its executives responsible for the fraud and misrepresentation, except for Defendants Cooke, Jones and Quick. The Goldman Sachs Entities eased Cooke out over the next two years to preserve some semblance of normality and continuity, and kept Jones and Quick onboard because they needed executives who knew the underlying businesses and finances. Upon information and belief, they "bought Quick's silence and cooperation" by causing AlphaStar to increase his salary by $125,000, and pay him a cash bonus of $150,000 in 1999. (¶ 194.)

In November 1999, the Board created an Ad Hoc Committee, composed of Jeffery, de Pourtales and McDonough, to interview candidates for three new outside directors. (¶ 195.) Between March 2000 and August 2001, the Board appointed Defendants Ford, Elliott and Christie upon recommendation by the Ad Hoc Committee.

(¶¶ 197, 200, 202.)  Upon information and belief, AlphaStar made these management changes at the insistence of the Goldman Sachs Entities.  (¶ 199, 201, 203.)  Upon information and belief, the Goldman Sachs Entities, Jeffery and de Pourtales may have kept Ford, Christie and Elliott, and possibly McDonough, ignorant of the true state of affairs at AlphaStar.  (¶ 204.)

Thus, from 1999 until at least January 2003, the Goldman Sachs Entities influence over the AlphaStar Board gave them de facto control over AlphaStar and its subsidiaries. (¶ 207.)  Andersen made a presentation to the Audit Committee in October 1999, noting "that management turnover problems were 'mitigated to some extent by the active participation of the Board of Directors, Audit Committee and Goldman Sachs in the transitioning of Len [Quick] into his new role as CEO.'"  (¶ 115.)

### 2.    Wasted Assets

As late as December 1999, AlphaStar reported that it had more than $50 million in cash and $30 million in marketable securities.  (¶ 222.)  The Goldman Sachs Entities and the Individual Defendants had a duty to preserve these assets, and should have begun liquidating AlphaStar and its subsidiaries in 2000, when they knew the companies were insolvent.  (¶ 243.)  Instead, over the next several years, the Goldman Sachs Entities, Jeffery and de Pourtales, with the assistance of Cooke, Jones, Quick, Crane, certain of other Individual Defendants and Andersen, wasted at least $80 million of AlphaStar's funds (consisting of more than $50 million in cash and more than $30 million in marketable securities).  (¶ 223.)  In particular, these defendants caused AlphaStar to commit the following acts:

### a.    Legal, Audit and Consulting Fees

AlphaStar spent at least $15 million on legal, audit and consulting fees for the years 2000 through 2003. (¶ 225.)   These expenditures were orchestrated by the Goldman Sachs Entities, Jeffery and de Pourtales, with the assistance of Cooke, Jones, Quick, Crane, Lawless, Del Tufo and certain other Individual Defendants.  (¶ 227.)

### b.    Settlements

AlphaStar paid at least $15 million to Trustmark and some of the other creditors of AlphaStar's hopelessly insolvent subsidiaries that had been defrauded by prior management.  (¶ 228.)  The Goldman Sachs Entities, Jeffery and De Pourtales also orchestrated these expenditures with the assistance of Cooke, Jones, Quick, Crane, Lawless and others.  (¶ 230.)

### c.    Dividends

During 2000 and 2001, the Board voted in favor of paying dividends in excess of $2 million, (¶¶ 232, 523), despite the fact that the directors were aware of the company's negative cash flow and insolvency.  (¶¶ 515-18, 520.)  AlphaStar did not receive any consideration for these payments.  (¶ 522.)  Goldman Sachs Entities, Jeffery and de Pourtales caused the Board to approve the payments with the assistance of Cooke, Jones, Quick, Crane, Lawless, Del Tufo and certain other Individual Defendants.  (¶ 232.) Crane testified that, while some Director Defendants expressed misgivings about paying dividends, Jeffery and de Pourtales supported the payment to prevent Goldman Sachs from receiving any more bad publicity.  (¶ 519.)  GS Funds and certain Individual Defendants even received a portion of the Dividends.  (¶ 524.)  As a result of the payment

of the Dividends, the Debtors were left with insufficient capital to run their businesses

and pay off their debts as they matured.  (¶¶ 526-27.)

### d.    Salaries and Bonuses

In 1999, AlphaStar paid salaries and bonuses, which the Amended Complaint

implies were excessive, to the Defendants Quick, Crane and Jones.  (See ¶ 233.)

AlphaStar paid total salaries and benefits of $19,688,000 in 2000 and $17,782,000 in

2001.  (¶ 234.)  Goldman Sachs Entities, Jeffery and de Pourtales orchestrated these

wasteful and unnecessary expenditures with the assistance of Cooke, Jones, Quick,

Crane, Lawless, Del Tufo and certain other Individual Defendants.  (See ¶¶ 235-36.)

### e.    The Investments in the U.K. Subsidiaries

AlphaStar made pre-petition loans of at least $14.5 million to the U.K.

Subsidiaries (the "U.K. Investments"), at a time when they were hopelessly insolvent.

(¶¶ 461, 464.)  By 1998, SCBIB and SCBRB faced numerous accusations of fraud and

misrepresentation, and their counterparties were rescinding their reinsurance contracts.  (¶

462.)  By 1999 (and by 2000 in the case of Crane), the Goldman Sachs Entities, Jeffery,

de Pourtales, Cooke, Jones, Quick and certain Individual Defendants knew, or absent a

reckless disregard for the truth should have known, that the U.K. Subsidiaries were

insolvent.  (¶ 465.)

The Board nevertheless approved the U.K. Investments, a portion of which paid

for settlements between the U.K. Subsidiaries and their defrauded creditors.  (¶¶ 466-67.)

AlphaStar loaned $5.5 million to the "hopelessly insolvent" SCBIB in 2001 and 2002

(the "SCBIB Loans"), (¶¶ 469-70), and SCBIB used part of the SCBIB Loans and part of

the U.K. Investments, amounting to at least $12 million, to pay the legal fees and

expenses incurred by Defendant Richards Butler in connection with the Sphere Drake

Case (the "Richards Butler Transfers").  (¶ 473.)   AlphaStar agreed to subordinate $4

million of the SCBIB loan to the claims of the other SCBIB creditors.  (¶474.)  The

Goldman Sachs Entities, Arthur Andersen, Jeffery, de Pourtales, Crane, and certain other

Individual Defendants knew, or absent a reckless disregard for the truth should have

known, that permitting AlphaStar to make the U.K. Investments was a waste of assets,

and as a result of their actions, the U.K. Investments were squandered.  (¶¶ 479-81.)

Notwithstanding the foregoing, between 2000 and 2002, AlphaStar's assets

continued to be wasted and squandered. Goldman Sachs Entities, Jeffery and de

Pourtales, with the assistance of Cooke, Jones, Quick, Crane, Lawless, Del Tufo and

certain of the other Individual Defendants continued to provide financial assistance to the

hopelessly insolvent U.K. Subsidiaries, and the Director Defendants continued to vote at

Board meetings to provide additional capital to the hopelessly insolvent U.K.

Subsidiaries.  (¶ 482.)

###### f.       The Investments in Realm

AlphaStar invested $25 million in Realm, a U.S. Subsidiary, (¶ 491) despite the

fact that Realm faced numerous accusations of fraud and misrepresentation, and its

counterparties were rescinding reinsurance contracts and suspending payments.  (¶¶ 492-

93.)  By 1999 (and by 2000 in the case of Crane), the Goldman Sachs Entities, Jeffery,

de Pourtales, Cooke, Jones, Quick and certain Individual Defendants knew, or absent a

reckless disregard for the truth should have known, that Realm was insolvent.  (¶ 494.)

Realm had suffered massive losses, (¶ 495), its assets, including accounts receivable and

deferred taxes, were overstated and should have been written down or off, (¶496), and its true financial condition was intentionally disguised in audited and unaudited consolidated financial statements for the years ending 2000 and 2001, and filed in 2000, 2001 and 2002.  (¶¶ 497-98.)    Upon information and belief, KPMG was unable to complete its audit because the company's records were inadequate, which made KPMG skeptical about whether Andersen's past audits were complete and accurate.  (¶¶ 500-01.)  Realm has been in liquidation since June 15, 2005.  (¶ 502.)

The Goldman Sachs Entities, Jeffery, de Pourtales, Cooke, Jones, Quick, Crane, Lawless, Del Tufo, certain of the other Individual Defendants and Arthur Andersen caused the funds constituting the Realm Investments to be squandered.  (¶ 503.)  The Goldman Sachs Entities, Jeffery, and de Pourtales, with the assistance of Cooke, Jones, Quick, Crane, Lawless, Del Tufo, and certain of the other Individual Defendants continued to cause AlphaStar to provide financial assistance to the hopelessly insolvent Realm between 2000 and 2002, all of which was approved by the Director Defendants. (¶ 504.)

### g.    Investments in the Bermuda Subsidiaries

AlphaStar invested $13 million in certain Bermuda Subsidiaries, including CIRCL, Raydon, Realm Underwriting and JEH Re (the "Bermuda Investments").  (¶ 505.)  By early 1999, CIRCL, Raydon, and JEH Re faced accusations of fraud and misrepresentation and their counterparties were rescinding their contracts.  (¶ 506.) During 1999, counterparties were suspending payments to CIRCL, (¶ 507), and CIRCL, Raydon and JEH Re were in run-off.  (¶ 508.)

Many of the defendants were aware of the foregoing. In early December 1998, Cooke knew that an employee of Realm Underwriting had complained in writing about the business ethics of Nicholas Brown, and expressed concern should the letter fall into the wrong hands. (¶509.) By 1999 (and by 2000 in the case of Crane), the Goldman Sachs Entities, Jeffery, de Pourtales, Cooke, Jones, Quick and certain of the other Individual Defendants knew, or absent a reckless disregard for the truth should have known, that the Bermuda Subsidiaries were insolvent. (¶ 510.) By November 2001, the Board recognized that CIRCL was insolvent, and in June 2002, caused CIRCL to be sold for $1.00. (¶¶ 511-12.) Despite their knowledge of the foregoing, between 2000 and 2002, the Goldman Sachs Entities, Jeffery and de Pourtales, with the assistance of Quick, Jones Cooke, Crane, Lawless, Del Tufo and certain of the other Individual Defendants continued to cause AlphaStar to squander its funds by providing additional capital to the "hopelessly insolvent Bermuda Subsidiaries." (¶¶ 513-14.)

### h.    Redemption of Goldman Sachs Entities' Shares

On December 31, 2002, AlphaStar announced that that it had redeemed the AlphaStar shares held by the Goldman Sachs Entities, amounting to 2,181,775 or 22.9% of its ordinary shares (the "Goldman Sachs Redemption"). (¶529.) Crane advised the Board that he had "hastily negotiated" the redemption without its approval, and that the Goldman Sachs Entities had agreed to accept a note in lieu of cash. (¶ 530.) The Board subsequently approved the redemption, with de Pourtales abstaining, (¶ 531), even though (a) AlphaStar had suspended paying dividends one year earlier, (¶ 532), (b) Crane had sent a letter to stockholders nine months earlier reporting that AlphaStar needed more

capital (¶533), and at a November 13, 2001 Board meeting, the Director Defendants

recognized that AlphaStar required a "significant capital infusion." (¶ 534.)

On January 30, 2003, AlphaStar wired $109,088.79 to Goldman Sachs Group to

pay for the redemption of the stock held by the Goldman Sachs Entities, and/or to satisfy

the notes issued to the GS Funds in connection with the redemption (the "Goldman Sachs

Transfer"). (¶ 535.) AlphaStar did not received reasonably equivalent value for the

transfer, did not have a surplus, and was insolvent at the time of the stock redemption or

was rendered insolvent because of it. (¶¶ 537-39.) In March 2003, two months after the

stock was redeemed, the Director Defendants unanimously agreed to liquidate AlphaStar.

(¶ 536.)

### D.    The Misleading Financial Statements

#### 1.    Andersen's Role

In April 1999, KPMG Peat Marwick resigned as auditors for AlphaStar, which,

upon information and belief, was prompted by the allegations in the RICO Action. (¶

125.) The Goldman Sachs Entities then used their leverage to persuade Andersen to

replace KPMG Peat Marwick as auditors for AlphaStar, (¶ 126), and Andersen served as

AlphaStar's independent auditor until May 2002. (¶ 245.) Hiring a "Big Five"

accounting firm was part of the Goldman Sachs Entities' plan to make AlphaStar look

viable, especially in light of the Goldman Sachs Group's then-pending IPO. (¶ 127.)

Andersen performed AlphaStar's audits in 1999, 2000 and 2001, and certified

each year's financial results through clean, unqualified audit opinions. (¶ 368.)

Andersen told the Audit Committee that it would give special attention to litigation

reserves, insurance balances receivable and payable, reinsurance recoverables, loss

reserves and bad debt reserves.  (¶¶ 352-53.)  During the 2000 and 2001 audits, it

considered these areas to be "high risk," requiring separate analytical review.  (¶ 354.)

Despite acknowledging this, Andersen failed to satisfy its ordinary obligation to

affirmatively assess and critically analyze these areas.  (¶ 355.)  Andersen also advised

the Audit Committee, prior to commencing each audit, of certain high "integrity risks,"

including Employee Fraud, Illegal Acts, Management Fraud and Reputation.  (¶¶ 357-

58.)  Andersen noted that AlphaStar's business had been "under intense public scrutiny,"

that "the litigation had caused uneasiness within the company and that the lawsuits had a

potentially adverse effect on AlphaStar and its affiliates' results and reputations."  (¶¶

359-60.)  Finally, Andersen acknowledged that if AlphaStar lost the Sphere Drake case, a

"substantial financial loss" would result.  (¶ 361.)

        The Amended Complaint alleges that Andersen breached its duties in various

ways.  In light of the Trustee's settlement with Andersen, it is unnecessary to detail those

breaches except to say that as a result, the AlphaStar financial statements for these years

were misleading.  In particular, Andersen's failures neglected to alert the public and the

innocent decision-makers on the Board  that AlphaStar had an insufficient amount of

reserves for litigation, and that the disclosure that AlphaStar made with respect to the

Sphere Drake Case was inadequate, (¶ 391), and that AlphaStar's financial statements

materially overstated its reinsurance balances receivable, understated its net losses, and

overstated its shareholder's equity, thereby misrepresenting AlphaStar's true financial

condition. (¶¶ 394-95.)

As a consequence of Andersen's errors, the corporate existence of AlphaStar and its subsidiaries was artificially prolonged.  (¶¶ 418, 423.)  The Goldman Sachs Entities and the Individual Defendants were able to continue to waste corporate assets and incur additional debt.  (¶ 410.)  The Goldman Sachs Entities and certain of the other Individual Defendants were able to conceal the fraud that riddled AlphaStar and its subsidiaries.  (¶¶ 421-22, 430.)  Andersen's misstatements masked AlphaStar's "deepening insolvency," (¶ 412), and prevented the innocent decision-makers from taking corrective action or redressing the corporate mismanagement and waste. (¶¶ 417, 431.)

After KPMG replaced Andersen, it indicated to the Board that it was considering issuing a "going concern qualification" in its 2002 audit opinion.  (¶ 456.)  It never completed the audit, however, or issued any opinion on AlphaStar's financial statements, (¶ 455), because on September 16, 2003, KPMG resigned as AlphaStar's auditor.  (¶ 457.)  AlphaStar filed a Form 8-K on November 3, 2003, stating that subject to the resolution of certain matters, and despite a going-concern qualification, KPMG was prepared to issue an unqualified audit report regarding AlphaStar's prior financial statements.  (¶ 458.)  KPMG responded that before resigning it had discovered previously unreported problems, and accordingly, had planned to re-audit past balance sheet accounts and determine the real effect of the Sphere Drake Case on AlphaStar.  (¶ 459.)  It also publicized its doubt that AlphaStar could continue as a going concern.  (¶ 459.)

2.    **The Defendants' Knowledge and Complicity**

The Goldman Sachs Entities, Jeffery, de Pourtales, Cooke, Jones, Quick, Crane, Lawless, Del Tufo and certain of the other the Individual Defendants (as well as Andersen) knew or should have known that AlphaStar's financial statements overstated

revenues and shareholders' equity, understated losses, and failed to reserve properly for litigation claims because litigation losses were probable and capable of being reasonably estimated.  (¶ 270.)  Despite their knowledge, the Goldman Sachs Entities, Jeffery and de Pourtales, with the assistance of Cooke, Jones, Quick, Crane, Lawless, Del Tufo and certain of the other the Individual Defendants, caused AlphaStar to file false and misleading financial statements with the SEC to deceive AlphaStar, its creditors and the members of the Board and the Audit Committee who were unaware of any wrongdoing. (¶¶ 271-72.)

The Amended Complaint highlighted several deficiencies relating to the effect of the pending Sphere Drake case on AlphaStar's insurance and reinsurance receivables (the "Receivables").  For example, the 2000 Form 10-K reported Receivables in the amount of $872,666,000.  (¶ 278.)  At least $800 million was attributable to the U.K. Subsidiaries, (¶ 279), but the 2000 Form 10-K stated management's opinion that the claims in the Sphere Drake action were without merit, and would be defended vigorously. (¶ 280.)  The disclosure was false and misleading.  (¶ 281.)  Furthermore, the Goldman Sachs Entities, Jeffery and de Pourtales, with the assistance of Cooke, Jones, Quick, Crane, Lawless, Del Tufo and certain of the other the Individual Defendants, set aside little or no reserves for the Sphere Drake or other litigation claims in the consolidated financial statements in the 2000 Form 10-K.  (¶ 282.)  Doing so would have seriously impacted AlphaStar's 2000 income and rendered it insolvent.  (See ¶¶ 283-87.)  The Goldman Sachs Entities and certain of the other the Individual Defendants caused AlphaStar to file the false and misleading 2000 Form 10-K to perpetuate the cover-up of AlphaStar's woes.  (¶ 288.)

The 2001 Form 10-K contained the same false and misleading statements.  It reported Receivables in the sum of $1,040,649,000, $900 million of which was attributable to the U.K. Subsidiaries.  (¶¶ 292-93.)   Management again opined that the Sphere Drake action lacked merit and would be vigorously defended.  (¶ 294.)  AlphaStar failed to reserve adequately, and had it done so, its net losses would have been significantly higher and AlphaStar would have been insolvent.  (¶¶ 296-301.)  The 2001 Form 10-K was filed by or with the assistance of the same defendants for the same improper reason.  (¶ 302.)  On or about November 14, 2002, AlphaStar filed a Quarterly Form 10-Q with the SEC for the quarter ending September 30, 2002, which reported, on a consolidated basis, assets of $1,097,084,000, shareholders' equity of $13,760,000, (¶ 303), and apparently, insurance broking assets and liabilities in excess of $900 million. (¶ 305.)

As a result of the fraud perpetrated by SCBIB and the other subsidiaries of AlphaStar, the counterparties of Realm, the U.K Subsidiaries and certain of the Bermuda Subsidiaries rescinded their contractual obligations, and the vast majority of the Receivables reported on the 2000 and 2001 Forms 10-K were uncollectible.  (¶¶ 307-09.) The total receipts for the period from July 17, 2003 (one day before the Sphere Drake decision) to March 31, 2006, were only $18.5 million.  (¶ 310.)

E.    **The Trustee's Claims**

The Amended Complaint contains the following 20 claims for relief:

| Count | Defendant(s) | Description of Claim(s) |
|---|---|---|
| 1 – 6 | Andersen | Breach of contract, malpractice, misrepresentation, breach of fiduciary duty, fraud and aiding and abetting a breach of fiduciary duty.  (¶¶ 581-608.)<br><br>These claims have been settled. |
| 7 | Goldman Sachs Entities and Individual Defendants | Breach of fiduciary duty causing damages of not less than $80 million.  (¶¶ 609-12.) |
| 8 | Goldman Sachs Entities, Jeffery, de Pourtales and "certain of the other Individual Defendants" | Knowingly defrauding the debtors and their creditors, and causing damages of not less than $80 million.  (¶¶ 613-16.) |
| 9 | Goldman Sachs | Breach of the Goldman Sachs Contracts, seeking an amount to be determined at trial.  (¶¶ 617-20.) |
| 10 | Goldman Sachs Entities | Piercing the corporate veil of AlphaStar to reach the assets of the Goldman Sachs Entities, and making their assets available to satisfy AlphaStar's liabilities.  (¶¶ 621-23.) |
| 11 | Goldman Sachs Entities | Aiding and abetting the Individual Defendants' breach of their own fiduciary duties and causing damages of not less than $80 million.  (¶¶ 624-627.) |
| 12 | Director Defendants | Recovering not less than $2 million in illegal dividends.  (¶¶ 628-29.) |
| 13 | Goldman Sachs Entities and certain Individual Defendants | Avoiding and recovering, under 11 U.S.C. §§ 544(b), 550(a)(1), the portion of the illegal dividends received by the Goldman Sachs Entities and "certain of the Individual Defendants."  (¶¶ 630-31.) |
| 14 | Director Defendants | Wrongful redemption causing damage in the sum of $109,088.79, plus interest. (¶¶ 632-33.) |
| 15 | Goldman Sachs Entities | Avoiding and recovering, under 11 U.S.C. §§ 548(a)(1)(B), 550(a)(1), the Goldman Sachs Redemption and the Goldman Sachs Transfer, in the amount of $109,088.79.  (¶¶ 634-35.) |
| 16 | Goldman Sachs Entities | Avoiding and recovering, under 11 U.S.C. §§ 544(b) and 550(a)(1), the Goldman Sachs Redemption and the Goldman Sachs Transfer, in the amount of $109,088.79.  (¶¶ 636-37.) |
| 17 | Goldman Sachs Entities | Avoiding and recovering, under 11 U.S.C. §§ 547 and 550(a)(1), the Goldman Sachs Redemption and the Goldman Sachs Transfer, in the amount of |

| 18 | Richards Butler | $109,088.79.  (¶¶ 638-40.) |
| | | Avoiding and recovering, under 11 U.S.C. §§ 544, 548 and 550(a)(1), the Richards Butler Transfers. (¶¶ 641-44.) |
| 19 | Goldman Sachs Entities and Individual Defendants | Equitable Subordination of claims under 11 U.S.C. § 510(b).  (¶¶ 645-46.) |
| 20 | Goldman Sachs Entities | Disallowance of claims under 11 U.S.C. § 502(d). (¶¶ 647-52.) |
| 21 | Richards Butler | Disallowance of claims under 11 U.S.C. § 502(d). (¶¶ 653-56.) |

# DISCUSSION

## A.    The Pleading Requirements

### 1.    Motion to Dismiss (FED. R. CIV. P. 12(b)(6))

On a motion to dismiss a complaint under FED. R. CIV. P. 12(b)(6), a court must

"accept all factual allegations in the complaint as true," Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 127 S. Ct. 2499, 2509 (2007); accord Leatherman v. Tarrant Cty. Narcotics

Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), even if the allegations are

doubtful in fact.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).   The

factual allegations must nevertheless be plausible, In re Elevator Antitrust Litig., 502

F.3d 47, 50 (2d Cir. 2007); Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007), and

"raise a right to relief above the speculative level."  Bell Atlantic, 127 S. Ct. at 1965;

accord ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

"[L]abels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do."  Bell Atlantic, 127 S. Ct. at 1965; accord Paycom Billing Servs. v.

Mastercard Int'l, Inc., 467 F.3d 283, 289 (2d Cir.2006)("we do not 'permit conclusory

statements to substitute for minimally sufficient factual allegations.'") (quoting Furlong,

<u>M.D. v. Long Island College Hosp.</u>, 710 F.2d 922, 927 (2d Cir.1983)); <u>Amron v. Morgan</u>

<u>Stanley Inv. Advisors Inc.</u>, 464 F.3d 338, 344 (2d Cir. 2006) ("bald assertions and

conclusions of law will not suffice" to defeat motion to dismiss (internal quotation marks

omitted)).

       "[C]ourts must consider the complaint in its entirety, as well as other sources

courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." <u>Tellabs</u>, 127 S. Ct. at 2509.  Courts may also consider "any

written instrument attached to the complaint, statements or documents incorporated into

the complaint by reference, legally required public disclosure documents filed with the

SEC, and documents possessed by or known to the plaintiff and upon which it relied in

bringing the suit." <u>ATSI Commc'ns</u>, 493 F.3d at 98; <u>accord</u> <u>Roth v. Jennings</u>, 489 F.3d

499, 509 (2d Cir. 2007); <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir.

2002); <u>Rothman v. Gregor</u>,  220 F.3d 81, 88-89 (2d Cir. 2000.)

       Finally, the lack of discovery is not a basis to deny the motion.  The liberal

pleading rules do

       not authorize parties to use an insufficient complaint with a conclusory
       allegation as a hunting license to discover whether in fact a viable claim
       may be alleged. The discovery rules are designed to support a properly
       pleaded cause of action and to prepare defenses to charges made not to
       discover whether a claim exists.

<u>Am. Commc'ns Ass'n. Local 10 F.B.T. v. Ret. Plan for Employees of RCA Corp. and</u>

<u>Subsidiary Cos.</u>, 488 F. Supp. 479, 484 (S.D.N.Y.1980) (Weinfeld, J.); <u>accord</u> <u>Hill v.</u>

<u>Philip Morris USA</u>, No. 03 Civ. 6922 (GEL) 2004 WL 1065548, at *8 (S.D.N.Y. May

11, 2004).

## 2. Fraud Claims (FED. R. CIV. P. 9(b))

Federal Civil Rule 9(b) requires the plaintiff to plead fraud with particularity. [4]

Even where fraud is not an element of the claim, the allegations must satisfy FED. R. CIV.

P. 9(b) if the claim is based on fraudulent conduct.  Krause v. Forex Exch. Mkt., Inc., 356

F. Supp. 2d 332, 338 n.49 (S.D.N.Y. 2005); see Rombach v. Chang, 355 F.3d 164, 171

(2d Cir. 2004) ("Rule 9(b) . . . is not limited to allegations styled or denominated as fraud

or expressed in terms of the constituent elements of a fraud cause of action.").  Although

scienter may be pleaded generally, the pleader must "allege facts that give rise to a strong

inference of fraudulent intent."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128

(2d Cir. 1994). [5]  The "strong inference" requirement is appropriate to ward off

allegations of "fraud by hindsight." See, e.g., Shields, 25 F.3d at 1129 (quoting Denny v.

Barber, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.)).  A strong inference of fraudulent

intent may be established "either (a) by alleging facts to show that defendants had both

motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness."  Id. at 1128; accord

ATSI Commc'ns, 493 F.3d at 99.

---

[4]     When these motions were briefed and argued, Rule 9(b) stated:

   (b) FRAUD, MISTAKE, CONDITION OF THE MIND.  In all averments of fraud or
   mistake, the circumstances constituting fraud or mistake shall be stated with particularity.
   Malice, intent, knowledge, and other condition of mind of a person may be averred
   generally.

Rule 9(b) was restyled, without material change, effective December 1, 2007.

[5]     The discussion that follows borrows heavily from case law interpreting the standard for pleading
scienter in securities fraud actions brought under the Private Securities Litigation Reform Act of 1995
("PSLRA").  Congress adopted the Second Circuit's "strong inference" standard when it enacted the
PSLRA.  Tellabs, 127 S. Ct. at 2509.  The same standard has been applied in this Circuit to non-securities
fraud claims.  See Serova v. Teplen, No. 05 Civ. 6748 (HB), 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16,
2006).

To qualify as "strong," "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of the other explanations." Tellabs, 127 S. Ct at 2510. The court must consider the inferences urged by the plaintiff and the competing inferences rationally drawn from the facts alleged. Id. at 2509-10. "A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

Rule 9(b) imposes additional limitations, two of which are important in this case. First, a pleader cannot allege fraud based upon information and belief unless the facts are "peculiarly within the opposing party's knowledge." Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 379 (2d Cir. 1974), cert. denied, 421 U.S. 976 (1975) overruled on other grounds, Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1100, n.9 (1991); accord Campaniello Imps., Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 664 (2d Cir. 1997). In those cases, the pleader must nonetheless allege facts upon which the belief is founded. Campaniello Imps., 117 F.3d at 664; Schlick, 507 F.2d at 379. Second, group pleading is generally forbidden because each defendant is entitled to know what he is accused of doing. DiVittorio v. Equidyne Extractive Indus. Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."); Granite Partners, L.P. v. Bear, Stearns & Co. Inc., 17 F. Supp. 2d 275, 286 (S.D.N.Y.1998) ("The pleading must give notice to each opposing party of its alleged misconduct. Thus, a claim may not rely upon blanket references to acts or omissions by all the defendants, for each defendant named is entitled to be apprised of the

circumstances surrounding the fraudulent conduct with which he is individually

charged.")

The one exception to group pleading concerns offering memoranda or written

solicitations.  The plaintiff need not show a connection between the fraudulent

representations and a particular defendant where the defendants are insiders or affiliates

that participated in the offer.  <u>DiVittorio</u>, 822 F.2d at 1247 (quoting <u>Luce v. Edelstein</u>,

802 F.2d 49, 55 (2d Cir. 1986)); <u>In re GeoPharma, Inc. Secs. Litig.</u>, 411 F.Supp.2d 434,

451 (S.D.N.Y. 2006).

## B.   The Trustee's Fraud-Based Claims

### 1.   Overview

The Amended Complaint is hardly concise, spanning 120 pages.  The Trustee

managed, however, to summarize his core claims against the defendants succinctly in his

<u>Sur-Reply Memorandum of Plaintiff Chapter 7 Trustee in Opposition to Defendants'</u>

<u>Motions to Dismiss</u>, dated Aug. 3, 2007("<u>Sur-Reply</u>").  (ECF Doc. # 163.)  The Trustee

contends that the defendants wasted AlphaStar's assets, squandering $80 million to

cover-up a fraud, albeit one they did not commit.  The former managers of AlphaStar's

U.K. Subsidiaries engaged in fraudulent activities in the London LMX insurance market.

These fraudulent activities generated over $800 million in Receivables, a significant asset

that appeared on AlphaStar's consolidated financial statements.  Without the Receivables,

AlphaStar's consolidated financial statements would have depicted an insolvent group of

affiliated companies.

The Amended Complaint alleges that the Goldman Sachs Entities knew the Receivables were worthless, but sought to hide that fact, and its adverse effect on AlphaStar's financial condition.  Consequently, the Goldman Sachs Entities embarked on a cover-up.  First, "the Goldman Sachs Entities, through Defendants Jeffery, de Pourtales and others, dominated and controlled the affairs of AlphaStar during the relevant period through their share ownership, board representation, audit and compensation committee membership, control over the appointment of new board members, control over AlphaStar's lawyers, [and] appointment as AlphaStar's investment bankers."  (Sur-Reply at 5.)

Second, acting through Jeffery and de Pourtales, they prolonged AlphaStar's corporate existence, causing AlphaStar to spend $80 million unnecessarily.  These expenditures included bogus investments in subsidiaries to avoid their collapse, settlements and preferential payments to creditors of AlphaStar's hopelessly insolvent subsidiaries to avoid publicizing fraudulent conduct, exorbitant directors fees and excessive compensation to insiders to ensure their cooperation and silence (i.e., bribes), dividends and redemption of the shares of AlphaStar owned by the Goldman Sachs Entities, legal fees to defend conduct that they knew, or should have known, was fraudulent, and exorbitant audit and consulting fees for an insolvent entity.  (Sur-Reply at 5-6.)

Third, the Goldman Sachs Entities caused AlphaStar to issue false financial statements and information in its SEC filings that misrepresented its financial condition, specifically, the value of the Receivables and the expenses of an attendant write down or write off.  (Sur-Reply at 12.)

Why did the defendants cover-up a fraud they did not commit?  The Trustee

contends that the Goldman Sachs Entities were motivated by three concerns:  their

liability to shareholders as underwriter in connection with AlphaStar's IPO, damage to

their reputation and Goldman Sachs' own IPO, and the impact of a sudden drop in the

value of their sizeable investment in AlphaStar.  (Sur-Reply at 5, 12.)  Once they had

avoided shareholder liability and successfully launched their IPO, they suddenly sought

to redeem their shares and exited AlphaStar.  (Id. at 8.)

Why did the other Individual Defendants, AlphaStar's officers and directors, let

this happen?  Although a few of the Individual Defendants may have initially been left in

the dark, they all eventually joined the cover-up, (Sur-Reply at 6), motivated by their

desire for excessive salaries and bonuses granted by the Goldman Sachs Entities through

their control of AlphaStar.  (Sur-Reply at 7.)  Based on these allegations, the Trustee

makes claims sounding in fraud, breach of fiduciary duty, aiding and abetting breach of

fiduciary duty and equitable subordination.  The individual causes of action are discussed

separately below, but given the overarching nature of the fraud theory, the Court first

addresses whether the Amended Complaint satisfies the Rule 9(b) requirements for

pleading scienter.

### 2.    Scienter and the Goldman Sachs Entities

#### a.  Motive and Opportunity

##### i.   Motive

A plaintiff may plead scienter by alleging facts that show a motive and

opportunity to commit fraud.  The allegations must entail concrete benefits that could be

realized by the fraud.  Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that

are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."); Shields, 25 F.3d at 1130 ("Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.")  Allegations that the defendants misrepresented the corporation's financial condition to inflate the stock price and protect or increase their compensation and maintain their positions are too generalized to demonstrate scienter. Kalnit, 264 F.3d at 139-40; accord Novak v. Kosaks, 216 F.3d 300, 307-08 (2d Cir. 2000); Shields, 25 F.3d at 1130; see Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996).

The motives attributed to the Goldman Sachs Entities fail as a matter of law because they are insufficiently concrete or personal.  First, the Trustee alleges that the Goldman Sachs Entities feared underwriter's liability arising from AlphaStar's IPO, but the motive to avoid personal liability "is too speculative and conclusory to support scienter."  Kalnit, 264 F.3d at 139; accord Martino-Catt v. E.I. duPont de Nemours and Co., 213 F.R.D. 308, 321-22 (S.D. Iowa 2003); Coates v. Heartland Wireless Commc'ns, Inc. 55 F.Supp.2d 628, 645 (N.D. Tex. 1999).  Second, the Trustee alleges that the Goldman Sachs Entities were concerned about their reputations.  Every businessperson is concerned about his reputation.  The motive to protect a business reputation is, therefore, too general to satisfy the pleading requirement for scienter.  In re Loral Space & Commc'ns Ltd. Secs. Litig., No. 01 Civ. 4388 (JGK), 2004 WL 376442, at *7 (S.D.N.Y. Feb. 27, 2004).

The Trustee embellished this allegation, linking the concern about reputation to the sale of Goldman Sachs shares under its own, imminent IPO. A plaintiff can plead scienter in the securities fraud context by alleging that an insider engaged in unusual trading activity during the period of the alleged fraud. See In re Scholastic Corp. Secs. Litig., 252 F.3d 63, 74 (2d Cir. 2001); Rothman, 220 F.3d at 94; Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995). The Trustee does not allege that the Goldman Sachs Entities were concerned about or actually traded in AlphaStar stock. Moreover, although the Amended Complaint refers to the Goldman Sachs IPO, it does not allege that Goldman Sachs was engaged in any unusual trading involving its own shares.

Third, the Trustee asks the Court to infer motive from the Goldman Sachs Entities' concern over the impact of a sudden drop in the value of their investment in AlphaStar. All investors, including insiders, want the value of their stock to remain high. Allegations of stock ownership do not imply a sufficient motive to satisfy Rule 9(b). Shields, 25 F.3d at 1131. These allegations are insufficient absent the additional allegation that the Goldman Sachs entities were engaged in unusual trading of AlphaStar stock during the period of the alleged fraud.

The allegation is also implausible as a factual matter, and undercuts the inference of fraudulent intent. See Atlantic Gypsum Co., Inc. v. Lloyds Int'l. Corp. 753 F. Supp. 505, 514 (S.D.N.Y. 1990)("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent."). One would expect that the AlphaStar stock price would have remained high during the cover-up, and then dropped when the truth came out. Here, however, the price of the AlphaStar

stock dropped before the cover-up began.[6]  The AlphaStar stock reached a high of $30

per share on April 21, 1998.  According to the Amended Complaint, the Goldman Sachs

Entities began their cover-up and related fraudulent activities in March or April 1999.  By

March 1, 1999, the stock price had fallen to $14.50 per share, and by April 1, 1999, to $7

per share.  On July 19, 1999, four years before the announcement of the Sphere Drake

decision, the price was down to $4.20 per share.  The most plausible inference from the

fall in the stock price is that the market had already discounted the value of AlphaStar's

stock as a result of information in the public domain.  In short, there was nothing to

cover-up.

### ii.    Opportunity

The Amended Complaint also fails to allege opportunity for many of the same

reasons.  "Opportunity would entail the means and likely prospect of achieving concrete

benefits by the means alleged."  Shields, 25 F.3d at 1130; accord Chill, 101 F.3d at 267 n.

4.  There is no opportunity to benefit from a "short respite from an inevitable day of

reckoning" in the absence of allegations that the defendant sought to obtain a concrete

benefit during the delay.  See Shields, 25 F.3d at 1130.  As noted, the Trustee failed to

allege a concrete benefit, but assuming that he had, there was no likely prospect of

obtaining that benefit through the cover-up.

The Amended Complaint discloses a cover-up plainly doomed to fail.  First, the

day of reckoning – the decision in the Sphere Drake case – was inevitable, at least

---

[6]         A court "may take judicial notice of well-publicized stock prices without converting the motion to
dismiss into a motion for summary judgment."  Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n. 8 (2d
Cir. 2000).  The relevant stock quotations are included as Exhibit 16 to the Declaration of Daniel Beller,
dated Jan. 31, 2007 ("Beller Declaration")(ECF Doc. # 108).

according to what the Trustee contends the Goldman Sachs Entities knew or should have known.  The Goldman Sachs Entities could not have hoped to preserve their reputation once the U.K. Court announced its decision.

Second, the Trustee contends that the underlying involvement of the U.K. Subsidiaries in the LMX fraud was publicly known long before July 2003.  (¶ 165 ("By 1999, it was clear based on public information," including information relating to "the pending litigation involving AlphaStar and its subsidiaries that AlphaStar faced a probable loss of staggering proportions.")  In short, Goldman Sachs could not have obtained a benefit by attempting to cover-up facts that were "clear based on public information," and confirmed by the foreseeable decision in the Sphere Drake case.

Third, the price of the AlphaStar stock had already fallen by the time that the cover-up began.

### b.    Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness.

In lieu of motive and opportunity, the plaintiff can plead scienter by alleging facts that demonstrate strong circumstantial evidence of conscious misbehavior or recklessness.  But "[w]here motive is not apparent…the strength of the circumstantial allegations must be correspondingly greater."  Kalnit, 264 F.3d at 142 (internal quotation marks and citations omitted).  The plaintiff must, therefore, allege "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  Id. (quoting Honeyman v. Hoyt (In Re Carter-Wallace, Inc. Secs. Litig.), 220 F.3d 36, 39 (2d Cir.2000) (citation

omitted)); <u>Chill</u>, 101 F.3d at 269.  In the securities fraud context, the plaintiff may state a

claim based on recklessness by specifically alleging that the defendants had knowledge of

facts or access to information that contradicted their public statements, and showed that

they knew or should have known that they were misrepresenting material facts.  <u>Kalnit</u>,

264 F.3d at 142; <u>Novak</u>, 216 F.3d at 308.  "An egregious refusal to see the obvious, or to

investigate the doubtful," may imply recklessness.  <u>Chill</u>, 101 F.3d at 269 (quoting

<u>Goldman v. McMahan, Brafman, Morgan & Co.</u>, 706 F. Supp. 256, 259 (S.D.N.Y.

1989)); <u>accord</u> <u>Novak</u>, 216 F.3d at 308.

There are limits to pleading conscious misbehavior.  First, a plaintiff cannot plead

fraud by hindsight.  <u>Shields</u>, 25 F.3d at 1129; <u>Denny</u>, 576 F.2d at 470.  Corporate

officials are not required to be clairvoyant.  <u>Novak</u>, 216 F.3d at 309 ("[A]llegations that

defendants should have anticipated future events and made certain disclosures earlier

than they actually did do not suffice to make out a claim of securities fraud."); <u>Acito</u>, 47

F.3d at 53 (lack of clairvoyance does not constitute securities fraud.)  Second, optimism,

however misguided, is not fraud.  "People in charge of an enterprise are not required to

take a gloomy, fearful or defeatist view of the future; subject to what current data

indicates, they can be expected to be confident about their stewardship and the prospects

of the business that they manage."  <u>Shields</u>, 25 F.3d at 1129-30.  "Where the plaintiffs

contend that the defendants had access to contrary fact, they must specifically identify the

reports or statements containing this information."  <u>Novak</u>, 216 F.3d at 309.  Third,

"allegations of GAAP violations or accounting irregularities, standing alone, are

insufficient to state a securities fraud claim" absent accompanying evidence of fraudulent

intent.  <u>Id.</u>

40

The Trustee contends, in substance, that the Goldman Sachs Entities knew or should have known that the U.K. Subsidiaries would lose the Sphere Drake case.  As a consequence, they also knew or should have known that it was a waste of money to defend it or prop up the AlphaStar subsidiaries, that the $800 million in Receivables were worthless and that AlphaStar was insolvent.  According to the Trustee, this actual or constructive knowledge derived from the Goldman Sachs investigation, the Fried Frank investigation, the Andersen reports, the allegations in the London arbitrations and the RICO investigation.  (See Sur-Reply at 6-7.)

The inference that the Trustee asks me to draw turns on the Goldman Sachs Entities' failure to anticipate a future contingency — the outcome in the Sphere Drake case; if the U.K. Subsidiaries prevailed, the Receivables would be collectible.  The outcome of any litigation is inherently risky.  Every trial lawyer has won cases he should have lost, and lost cases he should have won.  A party cannot, therefore, plead scienter by alleging that management knew or should have known that the company would lose a litigation.  See In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F.Supp.2d 188, 200 (E.D.N.Y. 2003) ("a legal theory dependent on predicting the outcome of a specific lawsuit is unduly speculative"); cf. Whitmore v. Arkansas, 495 U.S. 149, 159-60 (1990)("It is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case.").  A fortiori, the allegations contained in the pleadings do not provide a basis to infer fraud.  Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 758 (7th Cir. 2007).

Thus, to plead scienter based on conscious misbehavior, the Trustee must overcome a seemingly insurmountable obstacle.  He must identify specific contrary

information that the Goldman Sachs Entities egregiously failed to see indicating that the

U.K Subsidiaries were going to lose the Sphere Drake (or any equally significant)

litigation, or that the Receivables were uncollectible.  The Amended Complaint does not

allege that someone told the Goldman Sachs Entities that the U.K Subsidiaries were

going to lose the Sphere Drake or any other litigation, much less that the failure to heed

that information constituted an "extreme departure from the standards of ordinary care."

Instead, the Amended Complaint merely refers generally to investigations and

information, and states in conclusory fashion what the Goldman Sachs Entities knew or

should have known.[7]  As a result, these allegations also fail to give rise to a strong

inference of fraudulent intent.

### 3.    Scienter and the Individual Defendants

The foregoing discussion disposes of all but one of the scienter allegations that

the Trustee also directed at the Individual Defendants.  The Trustee alleges that "[b]y

overstating the value of AlphaStar's assets and shareholders' equity and hiding

AlphaStar's losses, the Individual Defendants were able to enrich themselves by, inter

alia, continuing to receive dividends, excessive compensation and other benefits from the

Debtors." (¶ 561.)  Allegations that the defendants misrepresented the corporation's

financial condition to inflate the stock price and protect or increase their compensation

and maintain their positions are too generalized to demonstrate scienter.  Kalnit, 264 F.3d

---

[7]    The Trustee had access to the fruits of the Fried Frank investigation.  AlphaStar retained Fried Frank, and the Trustee succeeded to the attorney-client privilege.  If Fried Frank had told the Goldman Sachs Entities that AlphaStar was going to lose the Sphere Drake litigation, the Trustee would have alleged it.  Similarly, the Trustee apparently had access to Andersen's work.

at 139-40; accord Novak, 216 F.3d at 307-08; Shields, 25 F.3d at 1130; see Chill, 101

F.3d at 268.

Furthermore, the Trustee's allegations suggest more plausible, innocent

explanations.  For example, the Trustee alleges, in substance, that the Goldman Sachs

Entities launched an internal investigation of its own, hired Fried Frank to conduct an

investigation, and after the learning the results, fired the former officers and directors

responsible for the wrongdoing and hired or obtained new management and outside

directors.  The Trustee sees this as part of the cover-up.  The Goldman Sachs Entities

were not involved in the underlying fraud, and a more reasonable inference is that they

acted responsibly to clean up the mess and ensure that it was not repeated.[8]

The Trustee also contends that the defendants caused AlphaStar to waste its

assets, including the payment of legal fees, other professional expenses, settlements,

salaries, dividends and investments in its subsidiaries.  AlphaStar, says the Trustee, was

insolvent and riddled with fraud.  Thus, any expenditure (other than to liquidate) was

fraudulent.  Yet AlphaStar's fiduciaries might plausibly conclude, in the exercise of their

business judgment, that the better course was to continue AlphaStar's business and fight

the U.K. litigations rather than fold AlphaStar's tent.  Choosing not to defend a "life and

death" litigation – which the U.K. Subsidiaries might win – seems to be the least

compelling alternative.

---

[8]     If the Goldman Sachs Entities had done nothing, the Trustee would doubtless be alleging that their
inaction was part of the cover-up.  Alternatively, if they had shut down AlphaStar without first conducting
an investigation, he would be accusing them of acting improperly.  See Higginbotham, 495 F.3d at 760-61.

Most troubling, the Trustee implies that the Goldman Sachs Entities caused

AlphaStar to pay Defendant Quick a substantial bribe to buy his silence.  (¶ 194 ("Upon

information and belief, the Goldman Sachs Entities <u>bought Quick's silence and

cooperation</u> by causing AlphaStar in 1999 to increase Quick's base salary from $200,000

to $325,000 per annum and award Quick a 1999 cash bonus in the amount of

$150,000.")(emphasis added).)  The Amended Complaint neglects to mention that Quick

had been serving as chief of operations in AlphaStar's North American-based

subsidiaries until July 1999, when he was appointed Chief Operating Officer of

AlphaStar.  (2000 Form 10-K, Item 4; 2001 Form 10-K, Item 4.) [9]  Quick became interim

CEO following the discharge of Cooke and prior to the hiring of Crane.  (<u>See</u> ¶¶ 61,184,

190.)  The Goldman Sachs Entities kept Quick (and Crane) on board "because they

needed executives who had knowledge of the underlying businesses and finances, (¶

194), and Andersen praised "the active participation of the Board of Directors, Audit

Committee and Goldman Sachs in the transitioning of Len [Quick] into his new role as

CEO."  (¶ 115.)

In short, AlphaStar needed Quick after it fired those implicated in the underlying

fraud.  Somebody had to run the company.  Quick's assumption of a new position and

emergency duties, rather than bribery, is the more plausible explanation for his increased

salary and bonus.

In conclusion, the Amended Complaint does not allege facts that give rise to a

strong inference of fraudulent intent.  The Trustee points to motives that are insufficient

---

[9]      The 2000 and 2001 Forms 10-K are annexed to the Beller Declaration as Exhibits 9 and 10,
respectively.

as a matter of law, and fails to identify specific information that would support the inference of conscious misbehavior.   Rather, the Trustee's conscious misbehavior argument is based largely on hindsight, a fact he candidly admits.  (Sur-Reply at 13)("In reviewing circumstantial evidence, we have the benefit of looking at past actions with 20/20 hindsight.").  Indeed, the Trustee's theory of the case – that the defendants joined in a futile, fraudulent cover-up of an earlier fraud they did not commit to hide information that everyone knew – lacks cogency.  Accordingly, the fraud-based claims will be dismissed.  Many of the causes of action also suffer from additional defects.  The remainder of this opinion focuses on the specific counts in the Amended Complaint.

## C.    Count 8 (Fraud)

Count 8 alleges a common law fraud claim against "Goldman Sachs Entities, Jeffery, de Pourtales and certain of the other Individual Defendants."  The elements of a common law fraud claim under New York law are (1) a material, false representation by defendant; (2) made with knowledge of its falsity; (3) with an intent to defraud, (4) reasonable reliance by the plaintiff; and (5) damages.  MacDraw, Inc. v. CIT Group Equip. Fin., 157 F.3d 956, 960-61 (2d Cir. 1998); see Chanayil v. Gulati, 169 F.3d 168, 171 (2d Cir. 1999); Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970-71 (2d Cir. 1987).  The law of Bermuda, where AlphaStar was incorporated, is the same.  (See Declaration of Jan Wladyslaw Woloniecki, dated Jan. 30, 2007, at ¶ 14 n. 9)("Woloniecki Declaration")(ECF Doc. # 107.)  The Amended Complaint fails to plead falsity, reliance and damages.

1.      **Falsity**

The common law fraud claim is based on the statements and alleged omissions in

the various SEC filings.  Although not apparent from the Amended Complaint, the

AlphaStar SEC submissions cited in the Amended Complaint disclosed the London

litigations and the disruption they had caused.  AlphaStar's 2000 Form 10-K and 2001

Form 10-K (as well as various quarterly and other submissions supplied by the parties)

include the following disclosures:

> a.   The brokerage segment had been "adversely affected by the disruption
>      caused by widespread reinsurance market disputes and legal
>      proceedings including those involving the Company."  (2000 Form 10-
>      K, Item 1 ("Brokerage"); 2001 Form 10-K, Item 1("Brokerage").)
>
> b.   "As a result of various disputes between insurers and reinsurers on
>      various reinsurance contracts, a number of the reinsurers have
>      suspended paying claims due under the contracts."  (2000 Form 10-K,
>      Item 7 ("Liquidity and Capital Resources"); 2001 Form 10-K, Item 7
>      ("Liquidity and Capital Resources").)
>
> c.   "Beginning in late 1998 and 1999, the reinsurance markets in which
>      the Company historically has been involved experienced considerable
>      disruption for a variety of reasons, including but not limited to the
>      LMX market disputes described above and other disputes involving
>      the North American workers' compensation insurance market.  The
>      effects of this disruption have continued up to the present time."
>      (2000 Form 10-K, Item 3(d); 2001 Form 10-K, Item 3(d).)
>
> d.   "One result of th[e] [reinsurance] market disruption has been that
>      certain reinsurers with whom the Company's broker subsidiaries
>      placed business on behalf of ceding insurer clients suspended claims
>      payments to those clients, as well as to the Company's insurance and
>      reinsurance subsidiaries, in certain instances also claiming a right to
>      rescind the reinsurance contracts."  (2000 Form 10-K, Item 3(d); 2001
>      Form 10-K, Item 3(d); Sept. 30, 2002 Form 10-Q, Part II, Item 1(d).)[10]
>
> e.    Sphere Drake had asserted that "the London Commercial Court
>      should infer a conspiracy between the broker and the underwriting

---

[10]      The Sept. 30, 2002 Form 10-Q is annexed as Exhibit 4 to the Supplemental Post-Argument
Declaration of Daniel J. Beller, dated Aug. 13, 2007 ("Beller Supp. Declaration")(ECF Doc. # 167.)

agent to defraud Sphere Drake, thereby allowing it to treat as void
from the outset all of the inwards reinsurance contracts placed with
Sphere Drake through its underwriting agent by the Company's broker
subsidiary."  (2000 Form 10-K, Item 3(a); 2001 Form 10-K, Item
3(a).)

    f.   In the London arbitrations, reinsurers have alleged that they sustained
losses due to an "'artificial' spiral in the LMX market" that "was not
disclosed to them by the ceding insurers or their reinsurance brokers"
(including AlphaStar's broker subsidiaries) and therefore "have
asserted that they are no longer obliged to honor their reinsurance
agreements and have suspended payment of claims."  (2000 Form 10-
K, Item 3(c); 2001 Form 10-K, Item 3(c).)

    g.   "If one or more reinsurers succeed in avoiding its contracts in the
pending arbitrations, it is possible that ceding insurer clients, on whose
behalf the Company's broker subsidiaries placed the reinsurance, may
seek to pursue a claim for indemnification or other claims against one
or more of those subsidiaries.  Similarly, if one or more of the
reinsurers fail to avoid its contracts in the pending arbitrations, it also
is possible that those reinsurers may seek to pursue some type of claim
against one or more of those subsidiaries"  (2000 Form 10-K, Item
3(c); 2001 Form 10-K, Item 3(c).)

AlphaStar cautioned that the outcome of the various litigations was uncertain and

it could not provide any assurances of the outcome, but believed, based on then available

information, that they would not have a material adverse effect on AlphaStar's financial

condition.[11]  (2000 Form 10-K, Item 3(c), (d); 2001 Form 10-K, Item 3(c), (d).)  The

evidence in the Sphere Drake case closed in 2002, and AlphaStar remained "cautiously

optimistic" that a successful result would be achieved.  (Sept. 30, 2002 Form 10-Q, Part I,

Item 2 ("Liquidity and Capital Resources"); (Part II, Item 1(a).)

The various SEC filings did not include a statement that AlphaStar would lose the

Sphere-Drake litigation, or that the Receivables were worthless, or that AlphaStar was,

---

[11]    The Form 10-Q, covering the third quarter of 2002, cited by the Trustee, (see ¶ 303), contains an
extensive discussion of the status of the various arbitrations and litigations, their potential effect on
AlphaStar, and management's optimism that the U.K. Subsidiaries involved in those litigations would
prevail.  (Beller Supp. Declaration, at Ex. 4, Part II, ¶ 3(c), (d) ("Legal Proceedings).)

therefore, insolvent.  These omissions underlie the fraud claim.  The Amended Complaint

alleges that the "financial statements were false and misleading, in that they overstated

revenues and shareholders' equity, understated losses, and failed to reserve for litigation

claims because losses from such litigation were then <u>probable and capable of being

reasonably estimated</u>." (¶ 270)(emphasis added.)  The Trustee lifted the emphasized

portion of the quoted allegation directly from <u>Statement of Financial Accounting

Standards No. 5 (As Amended) Accounting for Contingencies</u> (March 1975)("FAS 5")

issued by the Financial Accounting Standards Board.[12]   Under FAS 5, ¶ 4, "loss

contingencies" include the collectibility of receivables and pending or threatened

litigation.  A reporting entity must accrue (<u>i.e.</u>, charge as an expense) a loss contingency

when it is "probable" to occur and "[t]he amount of loss can be reasonably estimated."

(FAS 5, at ¶ 8.)  A contingency is probable if "[t]he future event or events are likely to

occur."  (<u>Id.</u> at ¶ 3.)

    For the reasons stated, the defendants could not have misrepresented the likely

outcome of the U.K. litigations because the outcome could not have been predicted with

the type of likelihood required by FAS 5.  Accordingly, AlphaStar was not required to

establish a loss contingency under GAAP.  The SEC submissions disclosed the fact of the

litigations and the tumult in the market, but expressed optimism as AlphaStar was

allowed to do absent contrary information.  In short, the Amended Complaint fails to

plead falsity.

---

[12]       A copy of FAS 5 is attached as Exhibit 4 to the Beller Declaration.

2.      **Reliance**

The Amended Complaint also fails to plead actual, much less reasonable or justifiable, reliance.  Those that extended credit or traded in AlphaStar stock may have cause to complain under the Trustee's theory, but the Trustee lacks standing to assert their rights.  Instead, the Trustee must plead facts showing that AlphaStar relied on the misleading omissions.

The Trustee suggests that there were "innocent decision-makers" on the Board who relied on these statements, (see ¶ 562),[13] and that "[u]pon information and belief, one or more of Messrs. Christie, Elliott, Ford and McDonough, as well as certain non-Defendant officers of the Debtors, may have been without knowledge of the misconduct described herein during certain periods relevant herein."  (¶ 576.)  But the Trustee also alleges that all of the Individual Defendants participated in squandering AlphaStar's assets to maintain the façade that it was viable, (¶¶ 243, 254), and "fraudulently prolonged [AlphaStar and its subsidiaries] beyond insolvency, thereby resulting in damage to the Debtors caused by wasted assets and increased debt."  (¶ 255.)  The Individual Defendants, without exception, committed "misconduct for their own benefit," (¶ 569), and "totally abandoned the interests of the Debtors, acted adversely to the interests of the Debtors, and acted solely to advance their own personal interests."  (¶ 571.)  Count 7 charges all of the Individual Defendants with breaching their fiduciary duties, and Counts 6 and 11 allege that Andersen and the Goldman Sachs Entities,

---

[13]      The Amended Complaint refers to the "innocent decision-makers" several times, but never identifies who they are.  (See ¶¶ 395, 412, 416, 417, 425, 429, 430, 431, 433, 434, 435, 436, 562, 602.)  The Trustee is hard-pressed to do so.  As noted in the text, he named all of AlphaStar's decision-makers as co-conspirators in the cover-up.

respectively, aided and abetted the Individual Defendants, without exception, to breach their fiduciary duties.  Finally, Count 19 seeks to equitably subordinate the claims of all of the Individual Defendants.

The Individual Defendants include AlphaStar's entire management.  Without doubt, some AlphaStar employees were unaware of the fraud alleged by the Trustee, but that is not enough.  All of the AlphaStar decision-makers knowingly bought into the cover-up, and consequently, AlphaStar could not have relied to its detriment on its own misleading financial statements.  See Bondi v. Bank of Am. Corp. (In re Parmalat Secs. Litig.), 383 F. Supp. 2d 587, 599 (S.D.N.Y. 2005)(Italian trustee failed to allege that debtor relied on defendant's fraud where debtor's officials participated in fraud and debtor was charged with their knowledge).

### 3.    Damages

For the same reason, the Trustee failed to allege how the false financial statements proximately caused the $80 million in damages spent during the cover-up.  Since the all of the decision-makers were involved in the cover-up, the false statements did not cause or contribute to the decision to squander AlphaStar's funds.  Based on the foregoing, Count 8 will be dismissed for failure to state a claim on upon which relief can be granted and the failure to plead fraud with particularity.[14]

---

[14]      In addition, the claim is directed at some but not all of the Individual Defendants, but the Amended Complaint does not specify who is in and who is out.  At a minimum, a party is entitled to know if he is the target of a particular claim and potential liability on that claim.

D.     **Counts 7, 12 and 14 (Breach of Fiduciary Duty)**

1.     **Introduction**

Count 7 charges that all of the defendants breached their fiduciary duties to

AlphaStar.[15]  Counts 12 and 14 allege additional breaches of fiduciary duty against the

Director Defendants.  Both sides agree that Bermuda law governs the existence and scope

of the defendants' fiduciary duties.   In general, Bermuda law recognizes a fiduciary duty

only where a party has "undertaken to act for or on the behalf of another in a particular

matter in circumstances which give rise to a relation of trust and confidence."

(Woloniecki Declaration ¶¶ 8-9 (quoting Bristol & W. Bldg. Soc'y  v. Mothew, [1998]

Ch. 1, 18 (C.A.).)

2.     **The Goldman Sachs Entities**

Kuwait Asia Bank E.C. v. Nat'l Mut. Life Nominees Ltd., [1991] AC 187 (P.C.),

decided by the Privy Council and directly on point, governs the breach of fiduciary duty

claim against the Goldman Sachs Entities.  There, the debtor AICS did business as a

money broker, and the plaintiff acted as the trustee for AICS's depositors.  AICS had five

directors.  The defendant, the beneficial owner of 40% of AICS's shares, nominated two

of those directors, its employees House and August.  After AICS became insolvent, a

depositor sued the plaintiff alleging a breach of duty, the plaintiff settled with the

depositor, and commenced an action for contribution.

The plaintiff named the AICS directors, alleging various intentional misdeeds and

acts of malfeasance.  It also joined the defendant, asserting, inter alia, that it was

---

[15]     Among other things, some or all of the defendants contend that they did not owe fiduciary duties
to AlphaStar's subsidiaries.  The Trustee's claim is that they squandered $80 million of AlphaStar's funds.
This claim does not implicate any possible duties owed to the subsidiaries.

vicariously liable for the acts of House and August, its employees and agents.  In

addition, the defendant was a substantial shareholder, and exercised power and control

over AICS.  Consequently, it owed a duty of care to the plaintiff and the unsecured

depositors, and breached that duty of care.  Id. at 202-03.

After first resolving issues relating to the service of process and jurisdiction, the

Privy Council turned to the question of the claims against the defendant.  It began by

laying down two general principles: "(1) A director does not by reason only of his

position as director owe any duty to creditors or to trustees for creditors of the company.

(2) A shareholder does not by reason only of his position as shareholder owe any duty to

anybody."  Id. at 217.  Furthermore, a shareholder does not assume a duty merely by

exercising its power to appoint directors:

> In the absence of fraud or bad faith (which are not alleged here), a
> shareholder or other person who controls the appointment of a director
> owes no duty to creditors of the company to take reasonable care to see
> that directors so appointed discharge their duties as directors with due
> diligence and competence.  One shareholder may lock away his paid up
> shares and go to sleep.  Another shareholder may take an active interest in
> the company, insist on detailed information and deluge the directors with
> advice.  The active shareholder is no more liable than the sleeping
> shareholder.

Id. at 221.  The Privy Council cautioned that a contrary rule would lead to unlimited

shareholder liability:

> The liability of a shareholder would be unlimited if he were
> accountable to a creditor for the exercise of his power to appoint a director
> and for the conduct of the director so appointed.  It is in the interests of a
> shareholder to see that directors are wise and that the actions of the
> company are not foolish; but this concern of the shareholder stems from
> self-interest, and not from duty . . . .  It does not make any difference if the
> directors appointed by a shareholder are employed by the shareholder and
> are allowed to carry out their duties as directors while in the shareholder's
> employment.

52

Id. at 221.

Thus, the shareholder owes no duty to the corporation, other than to avoid

wrongfully interfering with the employee-director's discharge of his duties:

> An employer who is also a shareholder who nominates a director owes no
> duty to the company unless the employer interferes with the affairs of the
> company.  A duty does not arise because the employee may be dismissed
> from his employment by the employer or from his directorship by the
> shareholder or because the employer does not provide sufficient time or
> facilities to enable the director to carry out his duties.  It will be in the
> interests of the employer to see that the director discharges his duty to the
> company but this again stems from self-interest and not from duty on the
> part of the employer.

Id. at 223.[16]

Accordingly, the Goldman Sachs Entities cannot be held liable simply because

they were shareholders of AlphaStar.  Nor can they be held liable vicariously for the acts

of their employees, Jeffery and de Pourtales.  (Woloniecki Declaration ¶¶ 11-12.)[17]

Instead, the Amended Complaint must allege the breach of an independent duty,

amounting to fraud or bad faith, through which the Goldman Sachs Entities exploited

their position to the detriment of AlphaStar.  (See Reply Declaration of Jan Wladyslaw

Woloniecki, dated July 13, 2007, at ¶¶ 14-16)("Woloniecki Reply Declaration")(ECF

Doc. # 151.)

---

[16]    A subsequent statement by the Privy Council clarified that the interference must consist of a
wrongful act:  "The bank never accepted or assumed any duty of care towards the plaintiff.   In the absence
of fraud or bad faith on the part of the bank, no liability attached to the bank in favour of the plaintiff for
any instructions or advice given by the bank to House and August."  Kuwait Asia Bank, 1 A.C. at 224.

[17]    In fact, de Pourtales, was a Managing Director of Goldman Sachs International, (¶ 75), a non-
party.

David Mainfroy Marks, the Trustee's expert, opined that the Trustee had pleaded three fraud/bad faith-based claims sufficient to avoid the limitations under Bermuda law: (1) the Goldman Sachs Entities directly interfered with and/or controlled the actions of AlphaStar, (2) the Goldman Sachs Entities were de facto directors of AlphaStar, and (3) the Amended Complaint states a claim for "fraudulent trading."  (See Affidavit of David Mainfroy Marks, sworn to Apr. 16, 2007, at ¶ 8)("Marks Affidavit")(ECF Doc. # 126.) The first two theories ignore the holding of the Kuwait Asia Bank court.  The Trustee's claims of interference and de facto directorship rest on two grounds: the Goldman Sachs Entities owned shares of AlphaStar and appointed two of its employees to the Board. These two facts provide the springboard for a host of conclusory allegations regarding control (and fraud).

Under Kuwait Asia Bank, however, neither stock ownership nor the appointment of its employees to the Board subjects the Goldman Sachs Entities to liability in the absence of fraud or bad faith.  Furthermore, while Bermuda law governs the existence and elements of the Trustee's breach of fiduciary duty claim, American law determines the sufficiency of the allegations.  See Baena v. Woori Bank, No. 05 Civ. 7018(PKC), 2006 WL 2935752, at *8 (S.D.N.Y. Oct. 11, 2006).  The Amended Complaint fails, for the reasons stated, to plead a breach of fiduciary duty claim based on fraud or bad faith.[18]

In addition, the de facto directorship theory relies on a doctrine that does not apply in Bermuda.  Under English law, those who are not de jure directors but actually run the company can be considered de facto or "shadow" directors with all the attendant

---

[18]    In addition, Amended Complaint fails to identify which of the Goldman Sachs Entities did what, and violates the rules against group pleading.

06-01524-smb    Doc 183    Filed 02/19/08    Entered 02/19/08 14:31:15    Main Document
Pg 55 of 80

liabilities.  (See Marks Affidavit ¶¶ 19-23.)  The concept of de facto directorship is one of

English statutory law that has not been adopted by the Bermuda courts.  (Woloniecki

Reply Declaration ¶¶ 21-22.)  Hence, it cannot support a claim under Bermuda law for

breach of fiduciary duty.

Finally, although the doctrine of fraudulent trading exists under both English and

Bermuda law, it does not help the Trustee.  Section 246 of the Bermuda Companies Act

of 1981 ("Companies Act"), the fraudulent trading provision, states:

> (1) If in the course of the winding up of a company it appears that any
> business of the company has been carried on with intent to defraud
> creditors of the company or creditors of any other person or for any
> fraudulent purpose, the Court, on the application of the Official Receiver,
> or the liquidator or any creditor or contributory of the company, may, if it
> thinks proper so to do, declare that any persons who were knowingly
> parties to the carrying on of the business in manner aforesaid shall be
> personally responsible, without any limitation of liability, for all or any of
> the debts or other liability of the company as the Court may direct.

The essence of fraudulent trading is the use of deceit to induce creditors to extend

credit.  (Woloniecki Reply Declaration ¶ 23.)  The creditors suffer the injury, not the

company that induced them to extend credit.  The Amended Complaint alleges that

AlphaStar squandered $80 million in assets, but does not allege that it fraudulently

induced any entities to extend credit that remains unpaid.  Even if it did, an American

bankruptcy trustee lacks standing to assert claims that belong to creditors.  See Caplin v.

Marine Midland Grace Trust Co. of New York, 406 U.S. 416, 433 (1972).  While § 246

extends the right to sue to a fiduciary appointed by the Bermuda court, the Trustee was

not appointed by the Bermuda Court.  (See Woloniecki Reply Declaration ¶¶ 23-25.)

Accordingly, the Trustee has failed to plead a claim for breach of fiduciary duty under

Bermuda law against the Goldman Sachs Entities.

55

### 3.    The Individual Defendants

Count 7 makes the same breach of fiduciary duty claim against all of the

Individual Defendants.  In addition, Counts 12 and 14 seek to impose liability against the

Director Defendants based, respectively, on the payment of illegal dividends and the

wrongful redemption of AlphaStar's stock.  These claims also sound in breach of

fiduciary duty under Bermuda law.  (Woloniecki Declaration ¶¶ 32-33; Marks Affidavit ¶

32.)

The Individual Defendants do not dispute that they owed fiduciary duties to

AlphaStar under Bermuda law.  Nevertheless, they argue that their potential liability is

limited to situations involving fraud or dishonesty that the Trustee has failed to plead.

Section 98(1) of the Companies Act allows a corporation to indemnify or exonerate its

officers and directors from liability for most breaches of fiduciary duty:

> (1) Subject to subsection (2), a company may in its bye-laws or in any
> contract or arrangement between the company and any officer, or any
> person employed by the company as auditor, exempt such officer or
> person from, or indemnify him in respect of, any loss arising or liability
> attaching to him by virtue of any rule of law in respect of any negligence,
> default, breach of duty or breach of trust of which the officer or person
> may be guilty in relation to the company or any subsidiary thereof.

The exception in § 98(2) refers to liability based on fraud or dishonesty.  "Dishonesty"

refers to the "failure to disclose a pecuniary interest in a transaction with the company,"

(Woloniecki Declaration ¶ 27; see Companies Act § 97(4)), or outright looting.

(Woloniecki Declaration ¶ 27.)

AlphaStar's bye-laws contained indemnification provisions.[19]  Section 124 states, in pertinent part:

> Subject to the proviso below, every Director, officer, member of a committee . . . shall be indemnified out of the funds of the Company against all liabilities, loss, damage or expense . . . incurred or suffered by him as such Director, officer, committee member or Resident Representative . . . PROVIDED ALWAYS that the indemnity contained in this Bye-Law shall not extend to any matter which would render it void pursuant to the Companies Acts.

Section 125, which covers litigation costs, provides in pertinent part:

> Every Director, officer, member of a committee . . . or Resident Representative of the Company shall be indemnified to the full extent permitted by law out of the funds of the Company against all liabilities incurred by him as such Director, officer, committee member or Resident Representative in defending any actual or threatened action or proceedings, whether civil or criminal or investigative, in which he is not adjudged or found to have committed any breach of a duty owed as a result of his position with the Company or to have breached any provision of the Companies Acts, or in connection with any application under the Companies Acts in which relief from liability is granted to him by the court. . . .

Both experts agree that AlphaStar's bye-laws provide a complete defense to any claims for breach of fiduciary duty that are not based on fraud or dishonesty. (Woloniecki Declaration ¶¶ 21-23; Marks Affidavit ¶ 27.)  The Trustee's claim must, therefore, satisfy Rule 9(b).  For the reasons discussed, it fails to allege a sufficient motive.  With the exception of their employment benefits, the Amended Complaint does not allege that any of the Individual Defendants had a pecuniary interest in any of the transactions that the Trustee has questioned.[20]  Furthermore, the Trustee does not assert a

---

[19]     The bye-laws are attached to AlphaStar's Form S-1 Registration Statement, which is attached as Exhibit 17 to the Beller Declaration.

[20]     The one possible exception, discussed in the succeeding text, concerns the payment of dividends while AlphaStar was insolvent.  The Amended Complaint alleges that all of the Individual Defendants were significant shareholders.  (¶ 556.)  This implies that they received dividends.  Nevertheless, the Amended Complaint does not allege that they failed to disclose their interests when the Board declared the dividends,

looting claim.  Thus, the Amended Complaint does not allege a fraudulent or dishonest breach of fiduciary duty.

The Amended Complaint also violates the rule against group pleading.  Putting the financial disclosures (which were not false) to one side, the Amended Complaint fails to identify which Individual Defendant committed any particular act.  This defect is serious because the cover-up began in early 1999 and spanned at least four years.  Ford and Lawless joined AlphaStar in March 2000, a year after the cover-up started.  (¶¶ 62, 66.)  Christie did not join the Board until May 2000.  (¶ 63.)  Elliott joined AlphaStar in August 2001, (¶ 64), and Del Tufo came on board in October 2001.  (¶ 65.)  Cooke was there when the cover-up began, but left AlphaStar in November 2001.  (¶ 205.)  These Individual Defendants were not affiliated with AlphaStar at the time when at least some of the wrongful acts occurred.  Accordingly, the Trustee's claims for breach of fiduciary against the Individual Defendants and Director Defendants are dismissed for failure (1) to state a claim upon which relief can be granted and (2) to plead fraud with particularity.

## E.      Count 11 (Aiding and Abetting Breach of Fiduciary Duty)

Count 11 alleges that the Goldman Sachs Entities aided and abetted the Individual Defendants in breaching their fiduciary duties to AlphaStar, and causing AlphaStar to squander $80 million.  Courts are divided over whether the claim for aiding and abetting a breach of fiduciary duty is governed by the law of the state of incorporation, or the choice of law rules applicable to ordinary tort claims.  Proponents of the former rely on the "internal affairs" doctrine while advocates of the latter maintain "that the aiding and

---

and the mere fact that they received dividends, like every other shareholder, does not imply fraudulent intent.

abetting issues do not involve determination of internal corporate governance matters themselves, as a primary violation of a fiduciary duty obligation has been taken as a given." Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.), 365 B.R. 24, 39-40 (Bankr. S.D.N.Y. 2007) at 39-40; accord LaSala v. UBS, AG, 510 F.Supp.2d 213, 230-31 n. 9 (S.D.N.Y. 2007). The parties discuss the law of both jurisdictions, and the result under each is the same.

1.    **New York Law**

The party asserting a claim for aiding and abetting a breach of fiduciary duty must plead and prove that (1) the fiduciary breached his obligations to another, (2) the defendant knew of the breach and gave substantial assistance, and (3) the plaintiff suffered damages as a result. See Design Strategy, Inc. v. Davis, 469 F.3d 284, 303 (2d Cir. 2006); Lerner v. Fleet Bank, N.A, 459 F.3d 273, 294 (2d Cir. 2006); Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 943 (2d Cir. 1998); Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir. 1986). A defendant provides "substantial assistance" when he "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)(internal citations omitted); accord Lerner, 459 F.3d at 294. "[A] third-party relationship between the alleged aider and abettor and the corporation is a necessary element in any such action." Solow v. Stone, 994 F. Supp. 173, 181 (S.D.N.Y.), aff'd, 163 F.3d 151 (2d Cir. 1998); Official Comm. of Unsecured Creditors of Grumman Olson Indus., Inc. v. McConnell (In re Grumman Olson Indus., Inc.), 329 B.R. 411, 425 (Bankr. S.D.N.Y. 2005).

As noted earlier, the Trustee lacks standing to assert claims that belong to creditors. "Whether a claim belongs to the debtor or to its creditors is a function of the substantive law governing each claim." Bondi, 383 F. Supp. 2d at 594. Under New York law, "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir. 1991); accord Breeden v. Kirkpatrick & Lockhart LLP (In re The Bennett Funding Group, Inc.), 336 F.3d 94, 100 (2d Cir. 2003); Wight v. BankAmerica Corp., 219 F.3d 79, 86 (2d Cir. 2000); Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 826 (2d Cir. 1997); cf. Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093 (2d Cir. 1995)(applying Connecticut law). The so-called Wagoner Rule "derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." Wight, 219 F.3d at 86; Bennett Funding, 336 F.3d at 100. "Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the Wagoner rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." Wight, 219 F.3d at 87; Mediators, 105 F.3d at 826.

There is one very narrow exception to the Wagoner Rule. Under the "adverse interest" exception, New York law will not impute the acts and knowledge of the agent where the agent engages in a scheme to defraud his principal on his own behalf or on behalf of another. Wight, 219 F.3d at 87; Center v. Hampton Affiliates, Inc., 488 N.E.2d 828, 829 (N.Y. 1985). To come within this narrow exception, the agent must totally abandon his principal's interest and act entirely for his own or another's benefit.

60

Mediators, 105 F.3d at 827.  It is not enough that the agent has a conflict of interest or does not act primarily for his principal.  Grumman Olson, 329 B.R. at 425; Goldin v. Primavera Familienstiftung (In re Granite Partners, L.P.), 194 B.R. 318, 331 n.15 (Bankr. S.D.N.Y. 1996); Center, 488 N.E.2d at 830.

Regardless of the circumstances, the adverse interest exception does not apply if the wrongdoing agent is the corporation's sole shareholder, Mediators, 105 F.3d at 827, or all of the corporation's management participated in the wrongdoing.  Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co., Inc.), 311 B.R. 350, 373 (S.D.N.Y. 2004). Under the "sole actor" rule, "the agent's knowledge [is imputed] to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal."  Mediators, 105 F.3d at 827; accord Bennett Funding, 336 F.3d at 100.  Even if the wrongdoer is not a "sole actor," the adverse interest exception is still inapplicable unless there is at least one "innocent" decision-maker among management or the shareholders who could have stopped the fraud.  Bennett Funding, 336 F.3d at 101 (assuming the existence of the "innocent insider" exception without adopting it); CBI Holding, 311 B.R. at 372-73 (rejecting the "innocent insider" exception but discussing its relationship to the Wagoner rule and the "sole actor" exception); Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34, 36-7 (S.D.N.Y. 1997) (dismissing the trustee's complaint for lack of standing based on the failure to allege the existence of an innocent member of debtor's management who could have been able to prevent the fraud had he known about it).

Assuming that the Amended Complaint actually pleaded an aiding and abetting claim,[21] it would be barred by the <u>Wagoner</u> rule.  First, the adverse interest exception does not apply.  The Individual Defendants are charged with wrongdoing committed while performing their duties as officers and directors on behalf of the corporation.  Those duties, and the acts complained of, included paying to defend litigations or settle claims brought against AlphaStar's subsidiaries, paying professionals to provide financial advice and auditing services to AlphaStar, paying salaries and bonuses to AlphaStar employees and investing in AlphaStar subsidiaries.  Whatever they did they did for AlphaStar, and the Amended Complaint does not adequately allege any adverse interest.

Second, even if the adverse interest exception appeared to apply, the "sole actor" rule would nullify the exception.    The Amended Complaint alleges that all of the Individual Defendants breached their fiduciary duty, engaging in the cover-up quarterbacked by the Goldman Sachs Entities.  There may have been innocent AlphaStar employees, but there were no innocent decision-makers.  Consequently, even if New York law recognized an "innocent insider" exception (to the "sole actor" exception to the "adverse interest" exception), it would not apply.[22]

### 2.    Bermuda Law

Both sides agree that Bermuda law recognizes a claim for "dishonest assistance," similar to the aiding and abetting claim under New York law.  (<u>See</u> <u>Woloniecki</u> <u>Declaration</u> ¶ 34; <u>Marks Affidavit</u> ¶ 34.)  To establish liability, the plaintiff must show

---

[21]        As discussed in earlier text, the Trustee failed to allege a legally sufficient breach of fiduciary duty claim against the Individual Defendants.  Hence, the Trustee failed to allege a primary violation that the Goldman Sachs Entities could aid and abet.

[22]        In light of this conclusion, it is unnecessary to consider the Goldman Sachs Entities' alternative argument that all of the insiders ratified the fraudulent conduct alleged by the Trustee.

that the third party dishonestly procured or assisted a breach of trust or fiduciary

obligation.  Royal Brunei Airlines Sdn. Bhd. V. Tan, [1995], 2 A.C. 378, 392 (P.C.).  The

test of "dishonesty" is an objective one.  Id. at 389.  The Goldman Sachs Entities do not

contend that Trustee lacks standing under Bermuda law to assert the claim of dishonest

assistance.

The claim nonetheless suffers from several obvious defects.  First, the Trustee

fails to plead a primary violation, the breach of fiduciary duty (or breach of trust).

Second, dishonesty is an element of the claim, and the Amended Complaint fails to allege

with particularity that the Goldman Sachs Entities did anything that would be considered

"dishonest" under Bermuda law.  Third, the claim fails to identify any conduct by the

Goldman Sachs Entities apart from what de Pourtales and Jeffery may have done.  The

claim of dishonest assistance comes down to one based on vicarious liability where the

actions of de Pourtales and Jeffery constitute both the primary violation and the dishonest

assistance of the primary violation.

In addition, the Amended Complaint pleads facts that bar the claim under the

principle of ex turpi causa non oritur action.  The doctrine is essentially the same as in

pari delicto, and provides that "no court shall lend its aid to a man who founds his cause

of action upon an immoral or an illegal act."  Palaniappa Chettiar v. Arunasalam Chettiar,

[1962] A.C. 294, 303 (P.C.) (quoting Holman v. Johnson, (1775) 1 Cowp. 341, 343 (Lord

Mansfield, J.)).  The conduct need not be criminal, and it is sufficient that the plaintiff

asserts a right that is "sufficiently anti-social to justify the court's refusing to enforce that

right."  Hardy v. Motor Ins. Bureau, [1964] 2 QB 745, 767 (Ct. App.).  If the allegations

establish ex turpi causa as a matter of law, the claim may be dismissed at the pleading

stage.  Cf. Official. Comm. Of Unsecured Creditors of Color Tile, Inc. v. Coopers &

Lybrand, LLP , 322 F.3d 147, 164 (2d Cir. 2003) (discussing the in pari delicto defense

under Texas law).

The Amended Complaint charges that the Individual Defendants committed

securities fraud under United States law as well as other fraudulent and dishonest

conduct.  The Goldman Sachs Entities' expert opined that the conduct was sufficient to

trigger the defense of ex turpi causa.  (Woloniecki Declaration ¶ 45.)  The Trustee's

expert would undoubtedly agree, given his view that AlphaStar's insiders violated

Bermuda's fraudulent trading laws.  (See Marks Affidavit ¶ 52.)

The parties disagree, however, over whether the insiders' conduct should be

imputed to AlphaStar and defeat the Trustee's claims.  As a rule, the authorized acts of a

corporation's agents will be attributed to the corporation, Meridian Global Funds Mgmt.

Asia Ltd. v. Secs. Comm'n, [1995] 2 A.C. 500, 507 (P.C.), but the wrongful acts done to

the company by a director will not.  (Woloniecki Declaration ¶ 42 n. 43.)  Where,

however, "the director's dishonesty has been committed or condoned as part of a scheme

approved by the board of directors itself . . . there would be no harm in describing the

director's act as the act of the company."  Arab Bank Plc v. Zurich Ins. Co., [1999] 1

Lloyd's Rep. 262, 279 (Q.B.) (dicta).

The Amended Complaint alleges a scheme to cover-up AlphaStar's insolvency

and its subsidiaries' fraudulent practices.  The scheme was orchestrated by the Goldman

Sachs Entities and joined in by all of the insiders.  Accordingly, the general rule of

imputation should apply, and bar the dishonest assistance claim.  (Woloniecki
Declaration ¶ 42.)

The Trustee disputes this conclusion on three grounds.  First, "the actions of
Defendants Jeffery and de Pourtales were the carrying out of fraudulent activities at the
behest of the Goldman Sachs Entities, and that neither imputation nor the maxim of ex
turpi causa applies."  (Omnibus Memorandum of Law of Plaintiff Chapter 7 Trustee in
Opposition to Defendants' Motions to Dismiss, dated Apr. 16, 2007, at 114)("Trustee's
Memo") (ECF Doc. # 125); accord Marks Affidavit ¶ 41.)  Second, the wrongful conduct
attributed to de Pourtales and Jeffery was directed at AlphaStar, and was not committed
by AlphaStar.  (Marks Affidavit ¶ 44; Trustee's Memo at 114.))  Third, Section 247 of
the Bermuda Companies Act[23] empowers the Trustee to bring an aiding and abetting
claim against de facto directors and officers without regard to the rules of imputation or
the maxim ex turpi causa.  (Marks Affidavit ¶¶ 42-43, 50-51; Trustee's Memo at 115.)

Turning to the last point first, § 247 of the Companies Act does not create any
substantive rights, and simply allows the liquidator to bring the same action that the
company could have brought.  (Woloniecki Reply Declaration ¶¶ 61-63.)  This mirrors
the American rule.  The liquidator (or trustee), stands in the shoes of the debtor

---

[23]     Section 247 provides in pertinent part:

  (1) If in the course of winding up a company it appears that any person who has taken
  part in the formation or promotion of the company, or any past or present director,
  manager or liquidator, or any officer of the company, has misapplied or retained or
  become liable or accountable for any money or property of the company, or been guilty
  of any misfeasance or a breach of trust in relation to the company, the Court may, on the
  application of the Official Receiver, or of the liquidator or of any creditor or contributor,
  examine the conduct of the promoter, director, manager, liquidator or officer, and compel
  him to repay or restore the money or property or any part thereof respectively with
  interest at such rate as the Court thinks just, or to contribute such sum to the assets of the
  company by way of compensation in respect of the misapplication, retainer, misfeasance
  or breach of trust the Court thinks just.

65

corporation, and can bring the same claims as the debtor, but subject to the same defenses.

Next, the Trustee's argument that de Pourtales and Jeffery carried on their fraudulent activities at the behest of the Goldman Sachs Entities is conclusory. Furthermore, the Amended Complaint does not specify any conduct attributable to the Goldman Sachs Entities other than the activities of de Pourtales and Jeffery. The Amended Complaint does not allege that the Goldman Sachs Entities <u>wrongfully</u> interfered with the performance of their duties as directors. Instead, the claim of dishonest assistance rests on the relationship between the Goldman Sachs Entities and de Pourtales and Jeffery.

Finally, the Trustee focuses on de Pourtales and Jeffery but ignores the allegations that sweep all of the other Individual Defendants into the fraudulent cover-up. Even if the cover-up were viewed as harmful conduct directed at AlphaStar, the participation of all of AlphaStar's insiders would result in the imputation of that conduct to AlphaStar. (<u>See</u> <u>Woloniecki Reply Declaration</u> ¶¶ 66-68.) Accordingly, the claim for dishonest assistance under Bermuda law is dismissed for the failure to state a claim or plead fraud with particularity.

**F.      Count 19 (Equitable Subordination)**

Relying on the allegations in the preceding 644 paragraphs, the Trustee seeks to equitably subordinate "any and all claims of the Individual Defendants and the Goldman Sachs Entities to the claims of all other creditors." The equitable subordination claim is based on the same fraudulent cover-up as the fraud, breach of fiduciary duty and aiding

and abetting claims.    All defendants other than Crane and Lawless moved to dismiss this

Count on the ground that they have not filed claims.[24]  Lawless and Crane did file claims,

and moved to dismiss on the ground that the Amended Complaint fails to plead the

predicate wrongful act.

Section 510(c) authorizes a bankruptcy court to subordinate claims upon a finding

of (i) fraud, illegality or breach of fiduciary duty, (ii) undercapitalization, or (iii) control

or use of the debtor as an alter ego for the benefit of the claimant. Nisselson v. Ford

Motor Co. (In re Monahan Ford Corp. of Flushing), 340 B.R. 1, 45 (Bankr. E.D.N.Y.

2006); Official Comm. Of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley &

Co., Inc., (In re Sunbeam Corp.), 284 B.R. 355, 363 (Bankr. S.D.N.Y. 2002); 80 Nassau

Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.), 169 B.R. 832, 838

(Bankr. S.D.N.Y. 1994).  If the creditor is an insider, his conduct is subject to greater

scrutiny.  Monahan Ford, 340 B.R. at 44.  The insider's inequitable conduct may fall

short of fraud, and in those circumstances, Rule 9(b) does not apply.  Matrix IV, Inc. v.

Am. Nat'l Bank and Trust Co. of Chicago (In re S.M. Acquisition Co.), No. 05 C 7076,

2006 WL 2290990, at *3 n.3 (N.D. Ill. Aug. 7, 2006) ("[I]t appears that non-fraudulent

inequitable conduct need not be plead with specificity in support of an equitable

subordination claim") (Aspen, J.).

If a creditor has not filed a claim, there is nothing to subordinate nor any case or

controversy to resolve.  Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund

Ltd.), 310 B.R. 500 (Bankr. S.D.N.Y. 2002), on which the Trustee relies, is

distinguishable.  There, the trustee brought an action to recover intentional fraudulent

---

[24]       The last date to file proofs of claim was June 19, 2007.

transfers and equitably subordinate any claim that the defendant, who had not filed a claim, might assert. The defendant moved to dismiss the intentional fraudulent transfer claim for failure to state a claim and the equitable subordination claim on the ground that it was not ripe. The court denied both motions. Addressing the latter claim, the court concluded that it was intertwined with the fraudulent transfer claim, and it would consider the question of equitable subordination in conjunction with the fraudulent transfer claim in the interest of prudence and judicial economy. Id. at 513.

In contrast, the fraud-based claims asserted by the Trustee are being dismissed. Thus, a hypothetical equitable subordination claim is not intertwined with any other claim that the Court must try, and there are no interests of prudence or judicial economy to serve; the trial would constitute a waste of time. Accordingly, the equitable subordination claim asserted against the defendants other than Crane and Lawless is dismissed on the ground that there is no case or controversy.

Crane and Lawless did file claims, and cannot make the same argument. The Trustee contends that his allegations of fraud and breach of fiduciary duty satisfy the requirement to plead inequitable conduct. (Trustee's Memo at 134.) As noted earlier, these are fraud-based claims that failed to satisfy Rule 9(b). Accordingly, the Trustee also failed to satisfy the pleading requirements to support his fraud-based equitable subordination claims against Crane and Lawless.[25]

---

[25] Obviously, the same conclusion applies to the equitable subordination claims directed against the other defendants.

G.      **Count 9 (Breach of Contract)**

Count 9 charges Goldman Sachs with breach of the Goldman Sachs Contracts.

The latter are defined as one or more contracts under which Goldman Sachs provided

financial advisory and investment banking services to AlphaStar.  (¶ 84.)  Count 9 also

asserts that Goldman Sachs breached the implied covenant of good faith and fair dealing

"by depriving AlphaStar of the right to receive the benefits under or preventing

performance of the Goldman Sachs Contracts, and by acting arbitrarily or irrationally in

exercising its discretion under the Goldman Sachs Contracts."  (See ¶¶ 86-90.)

The party alleging breach of contract under New York law must plead (1) the

existence of a contract; (2) performance of the contract by one party; (3) breach by the

other party; and (4) damages suffered as a result of the breach.  Rexnord Holdings, Inc. v.

Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).  The plaintiff must identify what contract

provisions were breached as a result of the defendant's acts.  Levy v. Bessemer Trust Co.,

N.A., No. 97 Civ. 1785 (JFK), 1997 WL 431079, at *5, (S.D.N.Y. Jul. 30, 1997); Kraus

v. Visa Int'l Serv. Assn., 756 N.Y.S.2d 853, 854 (N.Y. App. Div. 2003); Lebow v.

Kakalios, 548 N.Y.S.2d 686, 687-88 (N.Y. App. Div. 1989).

In addition, New York law implies the covenant of good faith and fair dealing in

every contract.  Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 294 F.3d

383, 394 (2d Cir. 2002); Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228,

230 (2d Cir. 1991); Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995).

The covenant encompasses "any promises which a reasonable person in the position of

the promisee would be justified in understanding were included," Times Mirror

Magazines, 294 F.3d at 394 (citation omitted), "a pledge that 'neither party shall do

anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract,'" Dalton, 663 N.E.2d at 291 (citation omitted) (quoting Kirke La Shelle Co. v. Armstrong Co., 188 N.E. 163, 167 (N.Y. 1933), and "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."  Dalton, 663 N.E.2d at 291.

The covenant is not boundless.  A duty of good faith cannot be implied that "'would be inconsistent with other terms of the contractual relationship,'" id. at 291-92 (quoting Murphy v. Am. Home Prods. Corp., 448 N.E.2d 86, 91 (N.Y. 1983)); accord Times Mirror Magazines, 294 F.3d at 394, or create independent obligations beyond those set forth in the contract.  See Warner Theater Assocs. Ltd. P'ship v. Metro. Life Ins. Co., No. 97 Civ. 4914 (SS), 1997 WL 685334 at *6 (S.D.N.Y. Nov. 4, 1997), aff'd in unpublished op., 149 F.3d 134 (2d Cir. 1998); CIBC Bank & Trust Co. Cayman Ltd. v. Banco Cent. Do Brasil, 886 F. Supp. 1105, 1118 (S.D.N.Y. 1995) ("[A]lthough the obligation of good faith is implied in every contract, it is the terms of the contract which govern the rights and obligations of the parties.")(citation omitted).

The starting point for the discussion should be the parties' contracts.  The Trustee does not, however, identify or quote the relevant provisions, or attach the Goldman Sachs Contracts to the Amended Complaint.  In its motion to dismiss, Goldman Sachs produced two letter agreements.  (Beller Declaration, Exs. 18, 19.)  These appear to be the

Goldman Sachs Contracts, and since the Trustee bases his claim on them, they may be

considered on this motion to dismiss.[26]

The two letter agreements appear to be identical. Goldman Sachs agreed, in each,

to act

> as financial advisor to assist the Company [AlphaStar] in its analysis and
> consideration of various financial alternatives available to it, and such
> other matters as to which you and we may agree during the course of our
> engagement. Such financial alternatives and other matters may include
> analyzing [AlphaStar's] financial condition, legal structure, operating
> history, ownership issues and senior management's long-term goals and
> objectives, financial restructurings, public or private financings (including
> the offering of securities), stock or debt repurchases, tender offers, merger
> or sale of [AlphaStar]

The letters did not cover engagements on specific transactions. In addition, AlphaStar

agreed to indemnify and exonerate Goldman Sachs for claims arising in connection with

the engagement except in the case of gross negligence or bad faith. Finally, the

agreements were governed by New York law.

The Goldman Sachs Contracts called for advisory services. Goldman Sachs did

not undertake the duty to run the company or to determine who AlphaStar should pay or

not pay. If Goldman Sachs took over AlphaStar and squandered its assets, as the Trustee

alleges, it had nothing to do with the financial advisory contracts.[27] In this regard,

---

[26]    If the letter agreements are not the Goldman Sachs Contracts, the Count should be dismissed because the Trustee failed to identify the relevant contract or provisions.

[27]    The Trustee contends that "[o]nce Goldman Sachs assumed additional duties by taking de facto control of AlphaStar, . . . the express agreement between the parties was amended." (Trustee's Memo, at 119.) Otherwise, "the logical extension of Goldman's argument is that it could take control of the company, fail to do so in good faith, and nonetheless avoid liability for its bad faith conduct. That result makes no sense and is contrary to law." (Id. at 120.)

It is the Trustee's argument that makes no sense. If Goldman Sachs undertook control of AlphaStar wrongfully, it arguably breached the independent duties as discussed above. It does not follow that its conduct would also amend existing financial advisory contracts between Goldman Sachs and AlphaStar, and make that conduct subject to the Goldman Sachs Contracts.

virtually all of the breach of contract allegations mirror the charges of fraud and breach of

fiduciary duty, and involve squandering $80 million in assets.  (<u>See</u> ¶ 93.)

Nevertheless, parts of the Amended Complaint specifically allege that Goldman

Sachs gave bad financial advice, or failed to give good financial advice.  In particular, ¶

94 alleges that Goldman Sachs breached the Goldman Sachs Contracts "by failing to

advise AlphaStar to preserve its cash and pursue strategies designed to foster AlphaStar's

interests, such as reducing cash expenditures, avoiding the incurrence of further

liabilities, suspending payment of dividends, reporting the true nature of its businesses

and financial condition, and effecting an orderly liquidation years earlier."  Ordinarily,

these allegations would plead a claim that Goldman Sachs breached its contract by giving

bad financial advice or failing to analyze, <u>inter alia</u>, AlphaStar's financial condition. [28]

This, however, is not an ordinary case.  The exoneration and indemnity clauses in

the Goldman Sachs Contracts limited liability to gross negligence and bad faith.  Gross

negligence, in this context, refers to conduct that "evinces a reckless disregard for the

rights of others or 'smacks' of intentional wrongdoing."  <u>Colnaghi, U.S.A., Ltd. v.</u>

<u>Jewelers Prot. Servs, Ltd.</u>, 611 N.E.2d 282, 284 (N.Y. 1993) (citation omitted).  The

Amended Complaint does not plead acts of gross negligence or bad faith that are

independent of the fraudulent cover-up.  This suggests that the Trustee's breach of

contract claim may be barred under the <u>Wagoner</u> Rule.  <u>See Hirsch</u>, 72 F.3d at 1092-94

(treating breach of contract claim against accountant as a malpractice claim and

---

[28]    The claimed breach of the implied covenant of good faith and fair dealing is harder to fathom.
The Amended Complaint alleges in conclusory fashion that Goldman Sachs acted arbitrarily and
irrationally in exercising its discretion.

concluding that the claim was barred under the <u>Wagoner</u> Rule ); <u>Color Tile</u>, 322 F.3d at

159 (when considering the applicability of <u>in pari delicto</u>, a court is not bound by the

complaint's characterization of a claim as one for breach of contract).  The Trustee may

be able to plead a breach of contract claim that will not be barred by the indemnity and

exoneration clause in the Goldman Sachs Contracts or the <u>Wagoner</u> Rule, and Count 9

will be dismissed with leave to replead.

**H.      Count 10 (Piercing the Corporate Veil)**

Count 10 seeks to pierce AlphaStar's corporate veil, and make the Goldman

Sachs Entities liable for all of its debts.  The law of the state of incorporation governs the

veil-piercing claim.  <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir. 1995).  AlphaStar

was incorporated under Bermuda law, and both sides cited Bermuda authority.  Under

Bermuda law, a shareholder is not liable for the debts of the corporation unless (1) the

corporation is a fraud or sham, or (2) acts as the shareholder's agent.  (<u>Woloniecki</u>

<u>Declaration</u> ¶ 37.)

The Amended Complaint does not allege facts showing that AlphaStar was a

"mere façade," used by the Goldman Sachs Entities to perpetrate a fraud.  AlphaStar was

a separately incorporated, public company.  The Trustee's expert disagrees, pointing to

the allegation in ¶ 218 in the Amended Complaint that "[u]pon information and belief,

the Goldman Sachs Entities exercised an inordinate amount of control over AlphaStar,

creating an extreme unity of interest and ownership, such that the Goldman Sachs Entities

and AlphaStar no longer had separate personalities."  (<u>See</u> <u>Marks Affidavit</u> ¶ 37.)  The

Amended Complaint does not identify the facts that support the Trustee's information

and belief, and this appears to be another conclusory allegation of control based on share

ownership and the nomination of its employees to positions on the Board. The conclusory allegation is insufficient under American pleading rules to state a claim to pierce the corporate veil based on fraud.

The Amended Complaint also fails to allege facts showing that AlphaStar served as the Goldman Sachs Entities' agent. Under Bermuda law, agency can only be created by consent express or implied. Leisure Time Ltd. v. Cox Hallett Wilkinson, [2005] Bda L.R. 61, at 8 (Sup. Ct. Berm.). "The mere fact of control cannot as a matter of law by itself give rise to an inference of either (a) acting in concert, [or] (b) acting as mutual agents." Id. at 9. The Amended Complaint fails to allege facts supporting an inference that the Goldman Sachs Entities and AlphaStar had an express or implied agreement that the latter would act as the former's agent. Rather, the veil piercing claim rests on the precept that the Goldman Sachs Entities "controlled" AlphaStar, but this is insufficient as a matter of Bermuda law. Accordingly, Count 10 is dismissed for failure to state a claim, and to the extent it depends on fraud, for failure to plead fraud with particularity.

## I.    The Avoidance Claims

### 1.    Count 13 (Dividend Payments)

Count 13 seeks to avoid and recover the "Dividends received by the Goldman Sachs Entities and any of the Individual Defendants as constructive fraudulent conveyances" under 11 U.S.C. §§ 544(b) & 550(a)(1). (¶ 631.) The Goldman Sachs Entities and de Pourtales are not seeking to dismiss Count 13. Most of the other Individual Defendants have moved to dismiss Count 13 on one or two grounds: (1) the Amended Complaint does not adequately plead insolvency, and (2) the Amended Complaint does not adequately identify which Individual Defendants received the

transfers.[29]  The constructive fraudulent transfer claim is not subject to the pleading

rigors imposed under Federal Civil Rule 9(b).  Nisselson v. Drew Indus., Inc. (In re

White Metal Rolling & Stamping Corp.), 222 B.R. 417, 428-29 (Bankr. S.D.N.Y. 1998).

The Amended Complaint sufficiently pleads that AlphaStar was insolvent at all

relevant times.  The entire thrust of the Amended Complaint is that the "fair valuation" of

Receivables was substantially less than the book value of $800 million, and AlphaStar's

liabilities actually exceeded its assets (at fair valuation).  This meets the Bankruptcy Code

definition of "insolvent."  See 11 U.S.C. § 101(32)(A).

In addition, although the Amended Complaint does not identify the actual

transferees by name, it alleges that all of the Individual Defendants had significant

shareholdings in AlphaStar.  (¶ 556.)  This implies that all received dividends.

Accordingly, the motions to dismiss Count 13 are denied.

### 2.    Counts 15, 16 and 17 (Redemption Payments)

Counts 15 and 16 seek to avoid and recover $109,088.79 from the Goldman Sachs

Entities on account of the Goldman Sachs Redemption and the Goldman Sachs Transfer

as constructive fraudulent conveyances or transfers pursuant to 11 U.S.C. §§ 544(b),

548(a)(1)(B) & 550(a)(1).  (¶¶ 635, 637.)  Count 17 seeks to recover the Goldman Sachs

Transfer from the Goldman Sachs Entities as a preference under 11 U.S.C. §§ 547(b) &

---

[29]    Del Tufo also argues that he did not receive any dividends, but the defense goes beyond the four
corners of the pleading. Memorandum of Law in Support of Motion of Defendants Stephen A. Crane and
Anthony J. Del Tufo to Dismiss the Amended Complaint, dated January 31, 2007 ("Crane and Del Tufo
Memo") at p. 36 n. 15. (ECF Doc. # 94.)  In addition, McDonough, Elliott and Ford have mistakenly
interpreted Count 13 to allege a claim for breach of fiduciary.  Memorandum of Law in Support of
Defendants McDonough, Elliott and Ford's Motion to Dismiss Amended Complaint, dated January 31,
2007 ("McDonough, Elliott and Ford Memo") at 15 (ECF Doc. # 99.)

550(a)(1).  (¶ 640.)  The Goldman Sachs Redemption refers to the December 31, 2002

announcement that AlphaStar had repurchased the Goldman Sachs Entities shares.  (¶

529.)  The Goldman Sachs Entities accepted a note in lieu of cash.  (¶ 530.)  The

Goldman Sachs Transfer refers to the January 30, 2003 payment of $109,088.79 to

Goldman Sachs Group to redeem "the stock held by the Goldman Sachs Entities, and/or

to satisfy the notes issued to the GS Funds in connection with the redemption announced

on December 31, 2002."  (¶ 535.)

　　　　The Goldman Sachs Funds are not seeking to dismiss Counts 15, 16 and 17, but

the remaining Goldman Sachs Entities are.  Goldman Sachs contends that these claims do

not mention or implicate it.  The Goldman Sachs Group argues that it acted as a conduit

and was not a transferee, citing Christy v. Alexander & Alexander of N.Y. Inc. (In re

Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52,

56 (2d Cir. 1997), cert. dismissed, 524 U.S. 912 (1998).

　　　　The Amended Complaint alleges that each of the Goldman Sachs Entities were

the actual or beneficial owners of the AlphaStar shares until December 31, 2002.  (See ¶

101.)  On December 31, 2002, AlphaStar announced the Goldman Sachs Redemption

constituting "all of the shares held by the Goldman Sachs Entities," (¶ 529), Crane

advised the AlphaStar Board that the "Goldman Sachs Entities had agreed to accept a

note in lieu of cash," (¶ 530), and "the Director Defendants unanimously…approved the

redemption of the shares of stock held by the Goldman Sachs Entities."  (¶ 531.)

Thereafter, "on January 30, 2003, AlphaStar wired [the money] to [the] Goldman Sachs

Group to pay for the redemption of the stock held by the Goldman Sachs Entities, and/or

to satisfy the notes issued to the GS Funds in connection with the redemption…." (¶ 535.)

Accepting these allegations as true, the Court concludes that the Amended Complaint adequately pleads that the Goldman Sachs Transfer was made to or for the benefit of each of the Goldman Sachs Entities. The moving defendants do not point to any other defect in these three claims, and accordingly, the motion to dismiss Counts 15, 16 and 17 is denied.

### 3.    Count 20 (Disallowance Under § 502(d))

Count 20 seeks to disallow any claims that the Goldman Sachs Entities might file under 11 U.S.C. § 502(d).[30]  As with the equitable subordination claims, the Goldman Sachs Entities allege that these claims are not ripe since they did not file proofs of claim. The bar date had not yet run when the Trustee filed his opposition, but he conceded that "[i]f the Goldman Sachs Entities never file a proof of claim in these cases, then the Twentieth Claim For Relief will be mooted."  (Trustee's Memo at 137.)[31]

The bar date has now run.  I take judicial notice that the claims register does not reflect a claim filed by any of the Goldman Sachs Entities.  Accordingly, Count 20 is dismissed.

### J.    Claims Against Quick

Quick never moved to dismiss the Amended Complaint.  A court may nevertheless dismiss claims sua sponte pursuant to FED. R. CIV. P. 12(b)(6) where the

---

[30]    Section 502(d) states in pertinent part:

   Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . or that is a transferee of a transfer avoidable under section . . . 544 [or] 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title.

[31]    The Trustee did not take the same position in opposing the motion to dismiss the equitable subordination claims made by the defendants other than Crane and Lawless.

77

complaint fails to state a claim for relief and the plaintiff was given notice and

opportunity to be heard.  <u>Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC</u>, 467 F.

Supp. 2d 394, 399 (S.D.N.Y. 2006); <u>Citadel Mgmt., Inc. v. Telesis Trust, Inc.</u>, 123 F.

Supp. 2d 133, 146-47 (S.D.N.Y. 2000); <u>see</u> <u>Wachtler v. County of Herkimer</u>, 35 F.3d 77,

82 (2d Cir. 1994).  Here, the Amended Complaint asserts the same claims against all of

the Individual Defendants.  Every defendant but Quick moved to dismiss the Amended

Complaint, and the Trustee defended against the motions.  Under the circumstances, the

Amended Complaint should be dismissed against Quick to the same extent as the other

Individual Defendants.  <u>See</u> <u>Citadel Mgmt.</u>, 123 F. Supp. 2d at 147.

**K.    Leave to Replead**

The Trustee seeks leave to replead any claims dismissed by the Court.  Generally,

leave to amend should be freely granted when justice so requires unless it would be futile.

<u>Acito</u>, 47 F.3d at 55; <u>see</u> <u>Lucente v. Int'l Bus. Machs. Corp.</u>, 310 F.3d 243, 258 (2d Cir.

2002) ("Where it appears that granting leave to amend is unlikely to be productive,

however, it is not an abuse of discretion to deny leave to amend.")(quoting <u>Ruffolo v.</u>

<u>Oppenheimer & Co.</u>, 987 F.2d 129, 131 (2d Cir.1993).)  The decision is committed to the

trial court's discretion.  <u>Ruffolo</u>, 987 F.2d at 131.

The original Complaint, filed on May 30, 2006 (ECF Doc. # 1), covered 85 pages

and 485 paragraphs.  The defendants moved to dismiss.  Rather than defend the motions,

and presumably informed of the defects the defendants identified, the Trustee chose to

file his Amended Complaint.  The Amended Complaint is approximately 50% longer.

The Trustee has not suggested any other facts that he could conceivably plead to bolster

the insufficient claims.  <u>See</u> <u>Hill</u>, 2004 WL 1065548, at *7 (denying leave to replead

where the plaintiff failed to "offer any additional facts that he could or would add to an amended complaint").

The reason may lie with the Trustee's theory, which cannot be cured through repleading. He alleges that AlphaStar squandered $80 million. A mismanagement claim will not survive in light of the Bermuda law and AlphaStar's bye-laws, discussed above. Consequently, he has attempted to plead fraud, arguing that the Goldman Sachs Entities oversaw a cover-up to avoid liability to the AlphaStar shareholders, preserve their reputation and their own IPO and maintain the value of their AlphaStar stock. He contends that the Individual Defendants joined the cover-up to keep their jobs and their existing or enhanced compensation. Even if the Trustee could plead more facts to bolster these inferences, these general motives are insufficient as a matter of law to sustain scienter.

In addition, the Trustee cannot identify any specific information that supports his theory of conscious misbehavior. The Trustee, in this regard, had access to information not generally available to the typical plaintiff. He conducted Rule 2004 examinations of Crane and Del Tufo. He had access to lawyers at Fried Frank as well as to the firm's investigation, and apparently, Andersen's files. Armed with the information that the Trustee's investigation derived (or should have derived) from these sources, he is simply unable to allege that anyone ever told any of the defendants that AlphaStar was going to lose the Sphere-Drake case, that the U.K. Subsidiaries should abandon their defense, or that the Receivables were virtually worthless. Moreover, his flawed theory is based on information that he claims the defendants covered up, but the public knew. In the end,

his conscious misbehavior claim is impermissibly based on 20/20 hindsight, as he candidly admitted

It would be futile to allow the Trustee to replead his fraud-based claims. He has already tried twice; he has not indicated what more he could say; and the defense of his claims has already subjected the defendants to a great deal of expense. Accordingly, the motion for leave to replead the dismissed claims is denied, except for the breach of contract claim to the extent discussed above.

Settle order on notice consistent with this opinion.

Dated: New York, New York
       February 19, 2008

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                   Chief United States Bankruptcy Judge